## Custody of Kali.

Franklin. March 6, 2003. - August 1, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Minor,* Custody. *Parent and Child,* Custody. *Probate Court,* Custody of child.

The court declined to consider a claim that did not rise to the level of acceptable appellate argument [838-839] and a claim not raised in the trial court [839-840].

Discussion of the origin of the "best interests of the child" standard, as applied in child custody determinations, and the criteria established by G. L. c. 209C, § 10 (*a*), that a judge must consider in reaching a decision on the issue of custody. [840-844]

In a child custody dispute between unmarried parents, the judge's final custody determination did not constitute an abuse of discretion, where his findings, although not specifically referencing G. L. c. 209C, § 10 (*a*), or the required considerations contained therein, reflected that he weighed all of the circumstances before him and attempted to structure a permanent custodial award to serve the child's best interests, including her continued and substantial involvement with both parents. [845-848]

Complaint to establish paternity filed in the Franklin Division of the Probate and Family Court Department on June 14, 2000.

The case was heard by *Geoffrey A. Wilson,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy H. Sibbison* (*John C. Gates* with her) for the father.

*Janet Hetherwick Pumphrey* for the mother.

*Thomas F. Reilly,* Attorney General, & *William E. Reynolds,* Assistant Attorney General, for Department of Social Services, submitted a brief.

Cordy, J. This case arises from a custody dispute between the unmarried parents of a child whom we shall call Kali. On July 12, 2002, a judge of the Probate and Family Court awarded sole legal and primary physical custody of Kali to her mother, and visitation and partial custody to her father. The father appealed

and this court granted his application for direct appellate review. We affirm the judgment.

1. *Background.* We summarize the findings of the probate judge. The mother and the father began dating in 1994 and the next year began living together in the father's home in Conway, Massachusetts. In January, 1998, the mother gave birth to Kali.[1] The relationship between the father and the mother (both of whom worked) rapidly deteriorated, in part because of disputes regarding Kali's care and the father's often extended work schedule. As a result, Kali and her mother moved to her mother's family home in Montague in the spring of 1998. They returned to the father's home later that year after the mother and the father reconciled, but moved back to Montague in January, 1999. In March, 1999, the mother moved to Ledyard, Connecticut, to work in Groton for an employer who also had operations in Springfield. She initially anticipated that she would be transferred back to Springfield, which is located near Montague.[2]

When the mother moved to Connecticut, both parents agreed that it would be best for Kali to live with her father at his home in Conway during the week and spend weekends with her mother. During her weekdays in Conway, Kali was principally in the care of a day care provider whom the mother had previously selected. Typically, Kali would be awakened by her father at approximately 5 A.M. and taken to the day care provider's home by 5:45 A.M. The father then left for his job as a mason, which required him to travel throughout western Massachusetts

[1] The father's paternity of Kali was not adjudicated by a court until he filed a complaint to establish paternity and obtain legal custody of Kali, which commenced this action.

[2] The parties and the judge each present a different chronology of these events. The judge found that the mother began working in Connecticut in March, 1999, and commuted from Montague to Groton for one year before permanently relocating to Connecticut. According to the father, the mother began working in the Ledyard, Connecticut, office in March, 1999, and immediately rented an apartment in Ledyard. The mother claimed that she began working in Connecticut in 1998, commuting to Connecticut until March, 1999, at which point she moved there permanently. Because the chronology on this point found by the probate judge does not fit logically with the rest of his findings, we accept that the mother relocated to Connecticut in March, 1999. Whether she commuted to Connecticut before that date is of no consequence to the legal questions at hand.

and occasionally Vermont. He would pick Kali up between 4:15 and 5 P.M. and spend each evening with her.

On the weekends, Kali visited her mother in Connecticut or the mother returned to Massachusetts to spend time with Kali either in Montague or at the father's home. As the father and the mother still maintained their relationship, the father often joined them on weekends. Although the mother claims that she paid for Kali's care during their weekends together and contributed $100 a week toward Kali's Massachusetts expenses, the father denies that the latter contribution was ever made, and the judge made no findings on this point.

These custodial arrangements continued until June, 2000, when the relationship between the father and the mother ended. The father then instituted the present action to establish paternity and obtain legal custody of Kali. In August, 2000, the probate judge adjudicated the father's paternity, and entered a temporary order awarding legal and physical custody of Kali jointly between the mother and the father, with each to have physical custody of Kali on alternating weeks. The judge also appointed a guardian ad litem (guardian) to observe Kali in each parental setting. Thereafter, during the weeks spent in Massachusetts with her father, Kali's daily schedule was the same as it had been during the previous year. During the weeks Kali spent with her mother in Connecticut, Kali was awakened at approximately 5:45 A.M. in order to be at day care by 6:45 A.M., where she would stay until 3:30 or 4 P.M. when her mother finished work.

Trial commenced seventeen months later, in January, 2002. The witnesses included the guardian, the day care provider, a friend of the father, family, and a clinical psychologist. The guardian testified that the parties should share legal custody and that primary physical custody should reside with the father. In July, 2002, the judge entered his final order, supported by findings of fact and conclusions of law. The judge awarded legal custody of Kali to the mother, and divided physical custody between the father and the mother corresponding with the school

year and vacations.[3] During the school year, Kali was to reside principally with her mother, with the father having custody of her three weekends a month. During the summer, Kali was to reside principally with her father, with the mother having custody every other weekend.[4] School vacation periods were to be split between the mother and the father. In addition, the father was to have unimpeded access to Kali's educational and health records, and was to be informed at least one week before, and have written input into, any major nonemergency decision with respect to her upbringing.

The judge's custody award was based on his conclusion that these arrangements were in the best interests of the child. This conclusion was based, in turn, on a number of findings, including, inter alia, that the mother and the father are not able to make shared decisions relative to their daughter's welfare, and joint legal custody would not be in Kali's interest[5]; that the mother provides well for Kali's physical needs, is concerned with her health and educational issues, and is the one who "preoccupies herself" with Kali's care regarding clothing, hygiene, doctor's appointments, and child care providers; that the father, while clearly fond of his daughter, and engaged in a positive relationship with her, does not appear to be "overly concerned" about Kali's physical needs "beyond the basics," and has "minimized" her medical needs and her need for medical care in general; that the father works long hours, often involving overtime, resulting in Kali's spending most of her time during the week in day care; that the mother has more flexible hours and is able to spend more time with Kali during the weekdays; that the mother is more "attuned" to Kali's medical, educational, and daily needs and is better able to

---

[3]The order was stayed by the Appeals Court pending the resolution of this appeal or Kali's entrance into kindergarten this fall, whichever occurs first. It appears that, at the present time, Kali is still living with each parent on alternating weeks.

[4]Each party was also able to designate an uninterrupted period of up to two weeks to spend with Kali during the summer.

[5]The parties do not contest the judge's conclusion that joint legal custody was not appropriate in light of the past inability of the parents to communicate productively about and jointly work together in making major decisions concerning Kali's well being. *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 404-405 (1981). See G. L. c. 209C, § 10 (*a*).

provide for Kali's welfare and physical needs during the week; that the father is more "attuned" to many of the activities that he and Kali can pursue together when time constraints because of his work schedule and her school do not interfere; and that it is important that Kali be able to spend as much time as possible with her father on weekends, holidays, and during school vacations to continue to foster their close and positive relationship.

2. *The father's claims.* On appeal, the father claims that (1) the decision of the probate judge was in error because it violated the prohibition against gender discrimination contained in art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments (prohibiting discrimination based on sex); (2) the probate judge applied the wrong standard ("best interests of the child") when he should have applied the "substantial change in circumstances" standard applicable to custody modification proceedings brought under G. L. c. 209C, § 20[6]; and (3) the probate judge failed to acknowledge adequately or consider adequately the standards for awarding custody to unmarried parents set forth in G. L. c. 209C, § 10 (*a*).

a. *Claims under the Constitution and G. L. c. 209C, § 20.* We can readily dispose of two of the father's three claims for relief. With respect to his constitutional claim, the father does little more than cite the Massachusetts Constitution and make an assertion that the probate judge's order would have been different had the genders of the parties been reversed. This claim does not rise to the level of appellate argument, and we decline to consider it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) (appellant's arguments shall contain "citations to the authorities, statutes and parts of the record relied on"); *Adoption of Kimberly*, 414 Mass. 526, 536-537 (1993) (three-sentence argument did not assist court with meaningful citation of authority and did not rise to level of acceptable ap-

---

[6]General Laws c. 209C, § 20, gives the Probate Court jurisdiction to modify an existing judgment for support, custody, or visitation. Such a modification should be made only if "a substantial change in the circumstances of the parties or the child has occurred." *Id.*

pellate argument).[7]

We also decline to consider the father's claim that the probate judge should have applied the "substantial change in the circumstances" standard applicable to modification actions brought under G. L. c. 209C, § 20, rather than the "best interests of the child" standard applicable to custody determinations under G. L. c. 209C, § 10 (*a*). The premise of the father's claim is that G. L. c. 209C, § 10 (*c*), operated to give him sole legal custody of Kali when the mother moved to Connecticut and "relinquish[ed]" Kali's care to the father,[8] and consequently, any change in Kali's legal custody would constitute a modification under § 20. While the mother disputes the father's contention that she "relinquished" the care of Kali within the meaning of § 10 (*c*), it is not necessary for us to consider the merits of their various points. It is clear from the record that the case in the Probate Court was tried under G. L. c. 209C, § 10 (*a*), not G. L. c. 209C, § 20, and on the theory that, prior to the trial proceedings, the mother and the father had joint custody of Kali. The father's arguments that G. L. c. 209C, § 10 (*c*), applies, that he was the sole legal custodian at the time the proceedings commenced, and that that status cannot be modified in the absence of a "substantial change in the circumstances" (as required by § 20) were not made to the probate judge and are waived. See *Baccanti* v. *Morton*, 434 Mass. 787, 803 (2001), and cases cited. While this court has, in exceptional cases, exercised its discretion to consider a claim not raised in the trial court where the opposing party would not be prejudiced by such consideration and consideration was necessary in order to prevent injustice or resolve an important question of law, see *Cruz* v. *Commissioner of Pub. Welfare*, 395 Mass. 107, 111-112 (1985), those circumstances are not present in this case. See *Commonwealth* v. *Fernette*, 398 Mass. 658, 667 (1986), quoting *Santa Maria* v. *Trotto*, 297 Mass. 442, 447

[7]While we do not consider the father's constitutional claim of sex discrimination, probate judges may not, of course, impermissibly take the gender of a parent into account when making their determinations. See *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 340-342 (1980).

[8]General Laws c. 209C, § 10 (*c*), states that "[i]f either parent is dead, unfit or unavailable or relinquishes care of the child or abandons the child and the other parent is fit to have custody, that parent shall be entitled to custody."

(1937) ("theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review").

b. *The requirements of G. L. c. 209C, § 10 (a).* We turn now to the father's sole preserved claim on appeal, that the probate judge failed to consider adequately the statutory factors set forth in G. L. c. 209C, § 10 (*a*).

Section 10 (*a*) gives a probate judge the power to award custody of nonmarital children "to the mother or the father or to them jointly . . . as may be appropriate in the best interests of the child." G. L. c. 209C, § 10 (*a*), first par. In reaching a decision on custody, the statute further provides that the probate judge "shall" (1) preserve "to the extent possible" the relationship between the child and the primary caregiver; (2) consider "where and with whom the child has resided within the six months immediately preceding" the action; and (3) consider whether either parent has established a "personal and parental relationship" with or exercised "parental responsibility" over the child. G. L. c. 209C, § 10 (*a*), second par. This case raises the question of the relationship between the "best interests of the child" standard set forth in the first paragraph of the statute and the three requirements set forth in the second. To resolve this question, we examine the origin of the "best interests of the child" standard, whether that standard has been modified by the enactment of G. L. c. 209C, and the judge's application of the standard in the present case.

In custody matters, the touchstone inquiry of what is "best for the child" is firmly rooted in American history, dating back to the Nineteenth Century. See generally Mercer, A Content Analysis of Judicial Decision-Making — How Judges Use the Primary Caretaker Standard to Make a Custody Determination, 5 Wm. & Mary J. of Women & the L. 1, 13-32 (1998) (describing evolution of Anglo-American jurisprudence since Seventeenth, Century). This legal principle replaced the notion that children were the property of their parents, and instructed courts to view children as individuals with interests independent of their parents. See *id.* at 21-29. The "best interests" standard appeared in our case law at least as early as 1865, in *Wardwell* v. *Wardwell*, 9 Allen 518, 522 (1865), in which the court held that

a judge should not follow a father's wish regarding the guardianship of his son if custody by the proposed guardian would not be in the child's "best interests." It has been adhered to ever since. See, e.g., *Blixt* v. *Blixt*, 437 Mass. 649, 657 (2002), cert. denied, 537 U.S. 1189 (2003) (best interests standard "has long been used in Massachusetts to decide issues of custody and visitation"); *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 710 (1985) ("best interests of the children always remain the paramount concern"); *Surrender of Minor Children*, 344 Mass. 230, 234 (1962), quoting *Erickson* v. *Raspperry*, 320 Mass. 333, 335 (1946) ("most fundamental [principle] is that the paramount issue is the welfare of the child"); *DeFerrari* v. *DeFerrari*, 220 Mass. 38, 41 (1914) (custody award is subject to revision "as the best interests of the child may demand"). See also Mercer, *supra* at 13 (calling best interests standard "prevalent ethical principle governing child custody decisions today"); Catania, Accounting to Ourselves for Ourselves: An Analysis of Adjudication in the Resolution of Child Custody Disputes, 71 Neb. L. Rev. 1228, 1244 (1992) ("In the overwhelming majority of jurisdictions in the United States, the guiding principle of law in child custody disputes . . . is the 'Best Interests of the Child' standard").

In spite of its widespread use as an appropriate standard for custody determinations, the "best interests of the child" formulation has been criticized by a number of commentators, who contend that the open-endedness of the standard leads either to an inconsistency of results or to the systematic imposition by courts of unnamed prejudices regarding what outcomes represent a child's best interests. See, e.g., Crippen, Stumbling Beyond Best Interests of the Child: Reexamining Child Custody Standard-Setting in the Wake of Minnesota's Four Year Experiment with the Primary Caretaker Preference, 75 Minn. L. Rev. 427, 499-500 (1990) (best interests standard "risks unwise results, stimulates litigation, permits manipulation and abuse, and allows a level of judicial discretion that is difficult to reconcile with an historic commitment to the rule of law" [footnotes omitted]); Elster, Solomonic Judgments: Against the Best Interest of the Child, 54 U. Chi. L. Rev. 1, 16 (1987) ("best interest principle is usually indeterminate when both

parents pass the threshold of absolute fitness"); Glendon, Fixed Rules and Discretion in Contemporary Family Law and Succession Law, 60 Tul. L. Rev. 1165, 1181 (1986) (" 'best interests' standard is a prime example of the futility of attempting to achieve perfect, individualized justice by reposing discretion in a judge . . . . Its vagueness provides maximum incentive to those who are inclined to wrangle over custody").

As a remedy for the perceived vagueness in the standard and for its apparent amenability to inconsistent application, Legislatures, courts, and commentators have adopted or proposed a number of constraints on judicial discretion or, in the alternative, specific criteria that a judge must take into account when ruling on the issue of custody. Some of these constraints have come in the form of irrebuttable presumptions, see, e.g., *Garska* v. *McCoy*, 167 W. Va. 69, 70 (1981) (primary caretaker proving to be fit parent of child of "tender years" must be awarded custody); others have come in the form of legislatively required considerations. See, e.g., Or. Rev. Stat. § 107.137 (2001).

These efforts also reflect the view that it is in the "best interests of the child" to preserve the current placement with a parent, if it is a satisfactory one, and that stability and continuity with the child's primary caregiver is itself an important factor in a child's successful upbringing. See, e.g., Catania, *supra* at 1260-1261 (describing primary caretaker presumption as "fair," "gender-neutral," "creat[ing] a legal norm that encourages nurturing behavior," and "serving as a concrete model for the kind of fiduciary conduct that members of a reordering family should continue to expect from one another"); *Roen* v. *Roen*, 438 N.W.2d 170, 174 (N.D. 1989) ("Continuity in a child's relationship with the closest, nurturing parent is also a very important aspect of stability"); *Davis* v. *Davis*, 749 P.2d 647, 648 (Utah 1988) ("considerable weight should be given to which parent has been the child's primary caregiver"). Echoing this view, the American Law Institute's Principles of the Law of Family Dissolution (2002) (ALI Principles) state that a judge "should" allocate custody in proportion to the amount of time

each parent previously spent providing care, subject to eight listed exceptions. ALI Principles, *supra* at § 2.08(1).[9]

General Laws c. 209C, § 10 (*a*), which was enacted in 1986, reflects this trend and is consistent with the more recently adopted ALI Principles.[10] The statute gives direction to the judge's consideration of a child's "best interests" by "evincing a general intent on the part of the Legislature to maintain the bonds between the child and her caregiver." *Custody of Zia*, 50 Mass. App. Ct. 237, 244 (2000). It cautions against rearranging a child's living arrangements in an attempt to achieve some optimum from all the available permutations and combinations of custody and visitation, when it is generally wiser and safer not to meddle in arrangements that are already serving the child's needs. If the parenting arrangement in which a child has lived is satisfactory and is reasonably capable of preservation, it is ordinarily in the child's best interests to maintain that arrangement, and contrary to the child's best interest to disrupt it. Stability is itself of enormous benefit to a child, and any unnecessary tampering with the status quo simply increases the risk of harm to the child.

The required considerations of the second paragraph of G. L. c. 209C, § 10 (*a*), neither replace the "best interests of the child" standard nor limit the factors that a judge may consider in determining what custodial arrangements are in the best

---

[9]Section 2.08(1) of the American Law Institute's Principles of the Law of Family Dissolution (2002) (ALI Principles) states, in pertinent part, that custody should be awarded "so that the proportion of custodial time the child spends with each parent approximates the proportion of time each parent spent performing caretaking functions for the child prior to the parents' separation or . . . before the filing of the action." The exceptions to this guideline are (a) that the award of custody should align with any "uniform rule of statewide application"; (b) that the award should respect the "firm and reasonable preferences" of a child of a certain (undefined) age; (c) that siblings should remain together if "necessary to their welfare"; (d) that the award should reflect any "gross disparity" in the child's attachment to the parents or in the parents' abilities to "meet the child's needs"; (e) that the award should reflect any prior agreement between the parties; (f) that the award should not create an "extremely impractical" custodial situation; (g) that the award should address a parent's decision to relocate to a distance away; and (h) that the award should "avoid substantial and almost certain harm to the child."

[10]General Laws c. 209C (concerning nonmarital children) was a new chapter of the General Laws inserted by St. 1986, c. 310, § 16.

interests of the child. See *Custody of Zia, supra* at 243-244 ("judge may consider any factors found pertinent to [child's best] interests in the circumstances [and] judge is to identify and weigh those factors"). Nor do they create a presumption that the caretaker with whom the child is primarily residing will be awarded permanent custody. See *id.* at 242-243. There may be serious shortcomings in the primary caretaker's parenting to date, or evidence that a previously exemplary caretaker will not be able to continue providing adequate care. Or, even assuming that the primary caretaker has been providing good care, and all indications are that that parent would continue to do so, it is possible that the other parent may offer some extraordinary advantage to the child that makes the disruption in the child's life worth the risk. In most cases, however, if the child has been living with one parent for some time, the child's needs are being adequately met under that parent's care, and that parent is capable of continuing to care for the child, it is not in the child's best interests to disrupt that successful arrangement. Rather, it is in the child's best interests to preserve it. Belief that the other parent might be a little better in some areas ought not suffice to disrupt a child's satisfactory home life with the caretaker parent.

For these reasons, the three requirements set forth in § 10 (*a*), second par., must be carefully considered by the judge in reaching a decision regarding custody. Moreover, merely considering these requirements at the end stages of the custody proceedings is not enough. In order to provide a child with the benefits of stability and continuity, these principles also need to be applied during the pendency of the proceedings. See ALI Principles, *supra* at § 2.08(1) (custody decisions should reflect each parent's performance of caretaking functions "before the filing of the action"). When the child has been living with one parent, the judge's initial inquiry on any motion for a temporary order of custody must be whether there would be any harm to the child in maintaining that status quo pending the outcome of the case. By definition, the significant benefits of maintaining the status quo, and the option of preserving those benefits, may be irreparably lost if the status quo is disrupted at the outset of the proceedings.

In light of these principles, we now consider the circumstances of this case.

3. *Discussion.* "The determination of which parent will promote a child's best interests rests within the discretion of the judge . . . [whose] findings in a custody case 'must stand unless they are plainly wrong.' " *Rosenberg* v. *Merida,* 428 Mass. 182, 191 (1998), quoting *Prindle* v. *Fisk,* 2 Mass. App. Ct. 843, 844 (1974). However, we will not sustain an award of custody "unless all relevant factors in determining the best interests of the child have been weighed." *Rosenberg* v. *Merida, supra,* quoting *Bouchard* v. *Bouchard,* 12 Mass. App. Ct. 899, 899 (1981).

The father contends that the judge's findings do not acknowledge or adequately consider the factors required by G. L. c. 209, § 10 (*a*). He is correct that the judge's findings do not specifically reference § 10 (*a*) or the three requirements of the second paragraph. He is incorrect, however, in his claim that the judge did not adequately consider them in his final custody determination. Ordinarily, a judge should both reference the statutory requirements and explain their impact, if any, on the custody award. Nevertheless, in this case, we look to the substance of the judge's findings and not to their form.

Beginning with the third required consideration (the establishment of a parental relationship with or responsibility over the child), the judge's findings are unequivocal: both parents established close personal and parental relationships with Kali, and in the long period between the entry of the temporary custody order and the date of judgment both parents regularly exercised parental responsibility over her health and well-being. As to the second required consideration (where and with whom the child resided within six months of the initiation of the proceeding), the judge's findings are equally clear. Kali resided with her father during the week and with her mother (often joined by her father) on the weekends.

Finally, with respect to the first requirement that the judge preserve "to the extent possible" the relationship between the child and the primary caregiver, the father argues that the judge's permanent custody order should have reverted to and preserved the specific arrangements for Kali's care that existed before the proceeding commenced because the father was Kali's primary caregiver. The temporary custody order entered at the

beginning of this action significantly altered Kali's living arrangements and the parties' parental responsibilities. Assuming that the father was the primary caregiver before proceedings began, his role as the primary caregiver was effectively destroyed by that order. A judge should not temporarily change a child's existing living arrangement so that he (or a guardian ad litem) can "compar[e]" the two parents, their respective homes, and their respective day care providers "on an even basis," or to give feuding parents an "incentive to get this matter heard as quickly as possible," as the judge said when he entered the temporary order requiring that Kali live with each parent on alternate weeks. Because of the temporary order, by the time the judge rendered his findings, the benefits of stability and continuity that should have been a major focus of the judge's analysis were eviscerated by two years of shuttling Kali from one parent to the other on a weekly basis.[11] Although the judge did not make a finding regarding which parent (if either) was the primary caregiver at the time of trial, it was certainly within his discretion to proceed as if neither parent occupied that role where the record contained ample evidence that, at that

_____

[11]The validity of the temporary order is not before this court. That the order may have affected the outcome of this case underscores the importance of carefully considering the preservation of stable living arrangements at the outset of a custody dispute. When the father sought a temporary order that he be allowed to maintain custody of Kali pending the outcome of the case, Kali had been living with him for over a year, from the time she was fourteen months old until she was two and one-half years old. Although she had been seeing her mother on weekends, she was often accompanied by her father during those weekend visits. Kali's home, and, at that age, the only "home" that she could ever remember, had been with her father. That arrangement could have been preserved with only the most minor difference, namely, that the father would no longer remain with her during any of her weekend visits to her mother. In all other respects, her life could have gone on normally, with no perceptible change in what she understood to be her "home." Yet, rather than inquire whether there would be any problem with leaving Kali at "home" pending the outcome of the proceedings, the judge entered an order that Kali split her time evenly between the two parents, spending alternate weeks with each. The child bounced back and forth in this fashion at least until the judge rendered his findings in July, 2002, and, we assume, thereafter. Moreover, the ostensible benefits that the judge used to justify Kali's living arrangements during the pendency of the proceedings proved ephemeral. The guardian ad litem, after making the even comparison, recommended that the father be awarded custody, but the judge rejected that recommendation. As for an expeditious resolution, it still took two years to complete the proceedings.

point, both parents regularly exercised proportional parental responsibility over Kali's care. Given such circumstances, the judge had little choice but to do what he did: abandon the requirements of the second paragraph of § 10 (*a*) in favor of a point-by-point comparison between two fit parents. It is apparent that the judge's final judgment was intended to accomplish the objective of preserving "to the extent possible" the relationship between the child and her parents at the time of his decision. The judgment was structured to ensure that both parents, each of whom had, during the pendency of the action, exercised responsibility as Kali's caregiver, and each of whom had established a positive parental relationship with her, would be able to preserve, foster, and strengthen those relationships. Kali is to spend school weekdays with her mother because her mother's schedule was sufficiently flexible to ensure that Kali's needs during those periods will be attended to, and because that schedule would also provide ample opportunity for the mother and daughter to spend time together. To the same end, the order provides that Kali is to spend most school year weekends with her father, when he will not be constrained by long work days.[12] The order splits summer and school vacations, with the larger block of time awarded to the father, to accommodate the type of activities that the trial evidence suggested formed the strongest basis for the ties between the father and daughter. Ultimately, the judge concluded that the mother was more "attuned to [Kali's] medical, educational, and daily needs" and this tipped the balance as to where the best interests of the child lay.[13]

The facts of this case, as presented to the judge at the trial,

---

[12]We would be troubled if the judge's award of primary custody between two working parents was based solely on the minor differences in the amount of time the child would spend in day care. Day care is a fact of life in such circumstances and ought not be used as the measure of a parent's ability or commitment to provide a protective, healthy, and positive environment for the child. We are satisfied here that the judge considered Kali's respective day care arrangements and the work schedules of her parents in the context of balancing many factors to reach a conclusion as to what is in Kali's best interests.

[13]Indeed, this case illustrates how subjective value judgments affect a judge's assessment of the child's best interests. See ALI Principles, *supra* at § 2.08 comment b (approach to determining child's best interests "draws the court into comparisons between parenting styles and values that are matters of parental autonomy not appropriate for judicial resolution") and § 2.02 com-

made the decision regarding custody a difficult one. Both parents obviously love and are capable of and committed to caring for their daughter. Leaving aside the award of temporary custody (from which the father did not take an appeal), the judge's findings reflect that he considered all of the circumstances before him and attempted to structure a permanent custodial award to serve the best interests of Kali, including her continued and substantial involvement with both parents. In these circumstances, we cannot say that the judge's resolution of the merits as they stood at the time of trial was an abuse of discretion.

4. *Conclusion.* The order of the Probate and Family Court judge is affirmed.

*So ordered.*

---

ment c ("When the only guidance for the court is what best serves the child's interests, the court must rely on its own value judgments, or upon experts who have their own theories of what is good for children and what is effective parenting"). Beyond the comparison of the day care providers and schedules, the judge was critical of the father because he "does not appear to be overly concerned about [Kali's] physical needs beyond the basics," whereas the mother "preoccupies herself with [Kali's] care regarding clothing, hygiene, doctor's appointments and childcare providers." To some, it would be preferable that a parent stay focused on "the basics" and not become "overly concerned" about things beyond those "basics," and some might think it a disadvantage to have a parent "preoccupie[d]" with the child's clothes and cleanliness. Even on the issue of medical care, where the judge viewed the mother as "more attuned," the differences between the two parents reflected justifiably different attitudes. Keeping the focus on whether the child's primary caretaker has provided and can continue to provide satisfactory care, rather than engaging in an inherently subjective assessment of which parent will provide what the judge views as optimal care, is part of the purpose behind § 2.08(1) of the ALI Principles and the second paragraph of G. L. c. 209C, § 10 (*a*).