## J.S. *vs.* C.C.

Suffolk. April 6, 2009. - September 10, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Parent and Child,* Custody, Child support. *Evidence,* Child custody proceeding. *Probate Court,* Findings by judge, Attorney's fees, Costs.

In a custody dispute in Probate and Family Court, the judge did not err in awarding physical custody to the mother, where the evidence supported the judge's thorough and careful factual findings and conclusions that the mother had the ability to parent the child going forward and that the father's concerns about the maternal uncle's behavior in relation to the child were dramatically overstated, and where the judge acted well within her considerable discretion in adopting the findings and conclusions of the guardian ad litem that the father's unsubstantiated beliefs about the uncle (and his attempts to prove those beliefs) interfered both with his ability to share custody with the mother and with his ability to parent effectively. [656-659]

This court concluded that a determination whether and to what extent the undistributed earnings of a Subchapter S corporation should be deemed available income to meet a parent's child support obligation must be made based on the particular circumstances presented in each case, including the parent-shareholder's level of control over corporate distributions, as measured by his or her ownership interest; the legitimate business interests justifying retained corporate earnings; and the presence of affirmative evidence of an attempt to shield income by means of retained earnings [659-664]; further, this court placed the burden on the parent-shareholder to present evidence that he or she does not have access to retained income, regardless of the shareholder's ownership percentage in the corporation, given that the shareholder is the party with greater access to the evidence [664-665].

Where the record of a custody dispute reflected that the judge, without giving any specific consideration to particular facts or circumstances, deemed the father's entire undistributed earnings from a Subchapter S corporation to be available income to meet his child support obligation, this court remanded the matter to the Probate and Family Court to allow for further consideration of the issue. [665]

In a custody dispute, the probate judge acted within her discretion in ordering the husband to pay a portion of the mother's legal fees, based on her conclusion that the father's actions had unnecessarily complicated and prolonged the litigation. [665-666]

CIVIL ACTION filed in the Suffolk Division of the Probate and Family Court Department on August 15, 2003.

The case was heard by *Nancy Gould*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*J.S.*, pro se.

*Paul P. Perocchi* (*Rachel Lipton* with him) for the mother.

BOTSFORD, J. This case arises out of the parties' dispute over the custody of their child, Sapphire.[1] A judge in the Probate and Family Court granted joint legal custody of Sapphire to the defendant (mother) and the plaintiff (father), and physical custody to the mother, subject to the father's right of visitation; the judge also ordered the father to pay child support in the amount of $1,000 per week, as well as various expenses related to the child. In addition, the judge ordered the father to pay a portion — $100,000 — of the mother's attorney's fees.

The father has appealed, arguing that (1) the judge erred in the award of physical custody to the mother; (2) the judge erred in treating as available to the father, for purposes of determining child support, the father's entire share of the 2005 undistributed earnings of the Subchapter S corporation (S corporation) in which the father held a majority ownership interest; and (3) the judge erred in awarding attorney's fees and costs to the mother. We affirm the judge's physical custody and attorney's fee awards to the mother. We conclude, however, that the judge erred in her treatment of the S corporation's retained earnings for purposes of determining the father's child support obligation and remand the case for further consideration of that issue.

1. *Background.* Sapphire was born to the father and mother, who never married, in 1997. The father and mother had a troubled relationship, and permanently ceased living together in 2002. In December, 2002, the parties retained a mediator to help them resolve issues regarding parenting and finances and, in connection with the mediation process, executed a written parenting agreement on March 21, 2003, that gave them shared legal and physical custody of Sapphire.

In August, 2003, the father filed a complaint for custody of the child pursuant to G. L. c. 209C, § 10 (*a*), prompted in large part by his belief that the child's maternal uncle was a pedophile.

---

[1] A pseudonym.

Thereafter, the mother counterclaimed for custody. The parties stipulated to the appointment of Dr. Robin M. Deutsch, a licensed psychologist and codirector of a program dealing with children and the law at Massachusetts General Hospital, to serve as guardian ad litem (GAL) to investigate the father's claim that the maternal uncle had engaged in inappropriate sexual behavior with Sapphire. The parties later agreed to expand Dr. Deutsch's duties to include evaluation of Sapphire's best interests in relation to custody. Dr. Deutsch's comprehensive investigation resulted in two lengthy reports.[2]

Between October and December of 2006, the judge conducted an eight-day trial on the issues of custody and support. In her decision issued in January, 2007, the judge found that from the time of Sapphire's birth, both parents were active in caring for her, although there were times in the child's life when one or the other of them took a more dominant role.[3] Sometime in 2001, the father developed the belief that Sapphire's maternal uncle was a pedophile, based on (1) games she had played at the uncle's house a handful of times when she was around three years old (in any event not past the age of four) and always in the mother's presence[4]; and (2) a photograph of Sapphire and her cousin, taken at the uncle's house, which the father believed depicted Sapphire wearing makeup. As to the games, the judge credited

---

[2]In connection with the first report, filed in the Probate and Family Court on July 18, 2004, Dr. Robin M. Deutsch conducted approximately seven hours of interviews with each parent; two hours of interviews and six hours of observation with Sapphire; an interview with the maternal uncle; psychological testing of the parents; collateral contacts with nine other parties; and reviews of dozens of records, including some 450 pages of "GAL General Fact Briefing Volumes" prepared by the father. The judge later requested an updated report, which was filed on October 23, 2006. In preparing the second report, Dr. Deutsch conducted an additional eight hours of interviews with the parents; over two hours of interviews with the child; collateral contacts with four other parties; and reviews of a number of additional documents. The two reports together are 131 pages long.

[3]At the time of trial in 2006, when Sapphire was nine years old, the mother and father were sharing physical custody of the child equally.

[4]In one game, after Sapphire's bath, she would run back and forth naked between two clothed adult family members, usually including a parent, who would each lift her up in the air, place her back on the ground and let her run back to the other adult. In the other game, an adult would place a long flotation device known as a "pool snake" in the back of a child's pants or underwear as part of a game of tag played with other children.

the testimony of Dr. Deutsch, and of Dr. John Daignault, a licensed forensic psychologist who testified on behalf of the mother, that the games showed no indication of inappropriate sexual conduct on the part of the uncle; the judge, however, concluded independently that the games were inappropriate, but that they did not rise to the level of sexual abuse. As to the photograph, the judge credited the mother's testimony that Sapphire was not wearing makeup, and concluded that the photograph was not indicative of sexual abuse. The judge further credited Dr. Deutsch's conclusions that as a general matter, there was no evidence of sexual abuse of the child or of any threat posed by the uncle, but that the father had constructed an elaborate theory of abuse through "faulty reasoning, misinterpretation of data, and errors of attribution."

The judge further found the following. The father did not report his suspicions of sexual abuse to law enforcement or confront the uncle directly, but he did begin to "stockpile and over-analyze any morsel of information that could profile [the mother's brother] as a pedophile."[5] The father also secretly videotaped interviews with Sapphire and, on March 21, 2003, the same day the parties executed the parenting agreement, conducted a secret "pre-briefing" with the parties' designated parenting coordinator where he presented claimed evidence of abuse but insisted that the mother not be informed of the evidence. The father also spoke about his beliefs of abuse with a number of people in Sapphire's and the mother's respective communities, including the head of Sapphire's former school, her then current teacher, and mutual friends of the mother and father. According to the father, the mother "suffered from serious mental health conditions including bipolar disorder," had issues with rage, and had reported hearing voices.[6] Dr. Deutsch reported that the child was "acutely aware" of the father's scrutiny of the mother's actions, and the

---

[5]For example, the father prepared a statistical analysis for Dr. Deutsch purporting to show a 98.48 per cent probability that the uncle was a pedophile, based on factors such as the games, the photograph, the uncle's age, and his left-handedness. The document listed, as additional factors perhaps affecting the probability, the uncle's numeric electronic mail address and alleged psychiatric and family history.

[6]The father's claims concerning the mother's mental illness and instability were disputed by the mother's treating psychiatrist and ultimately rejected by the judge.

child twice had threatened to report the mother to the father if she did not get her way.

This case was filed when the father tried and failed to convince the parenting coordinator to block a trip by the mother and Sapphire to visit the mother's family outside the Commonwealth, claiming that the maternal uncle was dangerous, and that the mother suffered from mental illness and was trying to leave the State with Sapphire permanently — claims that the judge found were unsupported. When the parenting coordinator refused to forbid the trip, the father told the child he had a stomach ache, brought the child to the emergency room of Massachusetts General Hospital to avoid transferring Sapphire's custody to the mother at the scheduled time, and rescheduled the mother's airplane tickets without telling her so that he would have time to file for an emergency order to prevent the trip.

The judge credited and adopted Dr. Deutsch's conclusion that the father's unsubstantiated beliefs and attempts to prove those beliefs had interfered both with his ability to share custody with the mother, and with his ability to parent Sapphire effectively. As a result, the judge ordered that the mother have physical custody of Sapphire, subject to substantial rights of visitation by the father.[7] The father appealed, and we transferred the case here on our own motion.

We reserve for later discussion facts specific to the judge's child support and attorney's fee orders.

2. *Discussion.* a. *The custody decision.* The father argues first that the judge erred in granting physical custody of Sapphire to the mother. The judge made her decision with reference to the best interests of the child, pursuant to G. L. c. 209C, § 10 (*a*). See *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 402 (1981) (in deciding issues involving custody, overriding concern must be best interests of child). "The determination of which parent will promote a child's best interests rests within the discretion of the judge . . . [whose] findings in a custody case 'must stand unless they are plainly wrong.' " *Custody of Kali*, 439 Mass. 834, 845 (2003), quoting *Rosenberg* v. *Merida*, 428 Mass. 182, 191

---

[7]In particular, the judge ordered that the father have visitation each Wednesday night, and every other weekend, for a total of five overnights out of every fourteen days. The judge also provided for equal division of Sapphire's Thanksgiving, Christmas, March, and summer vacations.

(1998). See *Matta* v. *Matta*, 44 Mass. App. Ct. 946, 947 (1998). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Mason* v. *Coleman*, 447 Mass. 177, 186 (2006), quoting Mass. R. Dom. Rel. P. 52 (a) (2006). "However, we will not sustain an award of custody 'unless all relevant factors in determining the best interests of the child have been weighed.' " *Custody of Kali, supra*, quoting *Rosenberg* v. *Merida, supra*.

The father argues first that the judge failed to consider "overwhelming" evidence presented at trial and weighing in his favor. He asserts the evidence showed that he was Sapphire's primary caretaker for a significant part of her life and at least an equal caretaker for the rest, and the child thrived under his care; the mother had a history of mental health issues, inability to control her rage, and violence against the father and the child; the maternal uncle exposed the child to inappropriate, sexually tinged behavior; and the mother had exposed the child to unsafe conditions in the maternal grandmother's home.

The judge specifically considered and rejected the father's arguments, concluding that the mother and father had split custody equally since 2002; each had fully and adequately cared for Sapphire's physical needs when Sapphire was in each of their care; the father's claims about the mother's anger were not credible; and the mother had successfully dealt with some issues affecting her mental health, so that the judge had confidence in her ability to parent Sapphire going forward. The judge also found that the father's concerns about the uncle's behavior in relation to Sapphire — including, most prominently, the games that had not been repeated since Sapphire was four years old — were dramatically overstated. The judge heeded the father's concerns about the maternal grandmother, and ordered that the child not be left alone in the maternal grandmother's care, but also noted that the mother had taken steps to protect the child. We have thoroughly reviewed the record[8] and conclude that the judge's factual findings and the conclusions she drew are supported by the evi-

---

[8]Included in the evidence we have reviewed is a videotape that shows "home videos" recorded by the uncle that do not include Sapphire, and secret recordings the father made of his conversations with Sapphire. The videotape was admitted in evidence at trial but not included in the record on appeal.

dence presented at trial and were well within her discretion to make.

The father next asserts that certain of the judge's findings were clearly erroneous. In particular, the father challenges the judge's findings that he did not report his concerns about the maternal uncle to law enforcement; Sapphire's threat that the father would "write another book" about the mother referred to the "GAL General Fact Briefing Volumes" prepared by the father; he "began to obsessively collect and document information regarding members of the [mother's] family"; he told a physician that he believed the uncle had previously sexually abused Sapphire and may do so again; his participation in mediation was disingenuous, and in fact his purpose was secretly to seek out and collect information about the mother and her family; and he revealed damaging information about the mother to some eighteen people with personal ties to Sapphire or the mother.

It is not clear that the judge's decision considered as a whole, with its 158 separate findings of fact, would represent an abuse of discretion even if the father's contentions about the erroneous nature of the discrete findings just described were correct; in any case, we conclude that the judge's findings were supported by the evidence.[9]

Finally, the father argues that the judge improperly relied on Dr. Deutsch's GAL reports and testimony in concluding that the

---

[9]The judge's inference that the father did not report his concerns about the mother's brother to law enforcement was reasonable, where there was no evidence of such a report introduced during trial, and where, given the intensity of the father's concern about this issue during the entirety of this case, the judge could permissibly assume that if he had contacted the police or other law enforcement authorities, he would have so indicated. The inference that the child's threat referred to the guardian ad litem (GAL) fact briefing volumes also seems reasonable, in light of the length and contents of the GAL briefing volumes prepared by the father, and the absence of any indication of any other "book" written by the father.

The finding that the father obsessively collected information about the mother's family is supported, for example, by the allegations of fact contained in the father's statistical analysis purporting to estimate the probability that the uncle was a pedophile (see note 5, *supra*). The finding that the father told his physician that the child had been sexually abused is not entirely supported — the contents of the conversation are not in the record — but it is undisputed that the father's statements to the physician resulted in a referral by the physician to a clinical social worker, who, based on the father's statements to her, filed an abuse or neglect report with the (then) Department of Social Services

father's disclosures to members of the mother and child's communities had a negative impact on Sapphire, and that the father's "obsessive and hyper-focused method of viewing issues involving [the child] compromise[d] his ability to parent and co-parent." The argument fails. The judge acted well within her considerable discretion in adopting Dr. Deutsch's findings and conclusions. See *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 875-876 (2006), quoting *Sarkisian* v. *Benjamin*, 62 Mass. App. Ct. 741, 745 (2005). The father raises a number of alleged weaknesses in Dr. Deutsch's investigation, but these points were ably presented to the judge, who nevertheless chose in her discretion to credit Dr. Deutsch and the substance of her exhaustive reports. The judge's conclusions find more than adequate support in the facts already discussed.

Contrary to the father's characterization of the judge's decision, we conclude that it represents a thorough, careful examination and evaluation of the trial evidence, reflecting a balanced weighing of facts and independent judgment. The judge recognized the father's deep love of his child and capacity to care for her, but ultimately reached a conclusion that is contrary to the father's own view of the pertinent facts and circumstances. Based on the record presented, the judge was entitled to do so.

b. *Child support award and inclusion of S corporation "pass-through" earnings.* The father argues that the judge erroneously included undistributed earnings of a closely held S corporation in her calculation of his income for purposes of determining his

---

under G. L. c. 119, § 51A. In any case, the finding is hardly key to the judge's conclusions.

The judge's finding that the father's participation in mediation was disingenuous is supported by the fact that, the day the parenting agreement produced by the mediation was signed, the father secretly contacted the parenting coordinator designated to resolve further disputes and presented materials designed to convince the coordinator that the child was at risk of abuse, while insisting that the mother not be shown the materials. Her finding that the father made damaging disclosures to eighteen people with ties to the mother or child is also adequately supported — if not as to the exact number of eighteen, at least as to a substantial number. There was evidence, inter alia, that the father told the child's kindergarten teacher that the child had been sexually abused; told a neighbor and mutual friend that the mother had been diagnosed with borderline personality disorder (a claim for which there is no support); and told the parenting coordinator that the child was in danger of being sexually abused and that the mother had "significant mental health issues."

child support obligation. "We review child support orders . . . to determine if there has been a judicial abuse of discretion." *Department of Revenue* v. *C.M.J.*, 432 Mass. 69, 75 (2000). See *Department of Revenue* v. *G.W.A.*, 412 Mass. 435, 441 (1992); *Freedman* v. *Freedman*, 29 Mass. App. Ct. 154, 155 (1990).

The record includes the following facts. The father is the chief executive officer and sixty-five per cent owner of a closely held corporation that has elected to be an S corporation.[10] On his financial statement filed with the court, the father indicated that his gross income for 2005 was $92,001.65, consisting largely of salary or wages paid to him by the corporation. He did not list any other monies from the corporation as part of his gross income. He did, however, indicate in an explanatory note that, while his tax returns reflected corporate profits or losses, he rarely received distributions from the corporation other than in the amount required to pay any tax liability attributable to the pro rata pass through of the corporation's income for income tax purposes. (See note 10, *supra.*)

At the time of trial in October, 2006, neither the father nor the corporation had filed tax returns for 2005. Nonetheless, the judge found, based on the father's testimony, that its 2005 profits were likely to be $400,000 to $500,000, and that the father would therefore report sixty-five per cent of that figure, or $260,000 to $325,000, on his individual tax return. She concluded that in light of the father's sixty-five per cent ownership interest in the corporation, his annual income in 2005 was likely to be at least $352,000 ($92,000 from salary and at least $260,000 from earnings or income attributable to him). The father argues that the judge erred in considering the pass-through earnings reported or to be reported on his income tax return as part of his gross income because those earnings were likely to be retained by the corporation rather than distributed to him.

[10] When a small business corporation elects to be an S corporation, its earnings or income is not taxed at the corporate entity level but is passed through and taxed to the individual shareholders on a pro rata basis, determined by each shareholder's percentage ownership interest in the corporation; the pass-through occurs whether or not the income is actually distributed. See *Bernier* v. *Bernier*, 449 Mass. 774, 775 n.2 (2007); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 558 (1997), citing 26 U.S.C. §§ 1361-1379 and G. L. c. 62, § 17A.

Neither this court nor the Appeals Court has directly addressed how to treat, for purposes of determining a parent's child support obligation, undistributed earnings of an S corporation that for income tax purposes are attributable to the parent-shareholder.[11] In doing so here, we begin with the Massachusetts Child Support Guidelines (Guidelines) because in cases where they apply, the Guidelines generally govern the determination of child support. See G. L. c. 209C, § 9 (*c*). Cf. *Croak* v. *Bergeron*, 67 Mass. App. Ct. 750, 754 (2006).[12] The Guidelines in effect at the time of trial determined a parent's child support obligation based on his or her available income, and defined the term "income" as "gross income from whatever source," including "income derived from business/ partnerships." Guidelines I(A). This definition leaves open the question whether undistributed earnings passed through to an S corporation shareholder solely for tax purposes qualify as "income derived from" the S corporation. As a result, the definition provides no useful guidance for determining the amount of income available to meet a child support obligation.[13]

Courts in a number of other jurisdictions have considered

[11]Cf. *Maillet* v. *Maillet*, 64 Mass. App. Ct. 683 (2005). The issue in the *Maillet* case was whether the plaintiff husband had misrepresented his income in the financial statement he filed in connection with the underlying divorce proceeding because he did not include any income from his S corporation. The court remanded the matter for further findings on this issue, but the opinion contains no information whether the S corporation's income or earnings were actually distributed to the husband or simply passed through to him for income tax purposes.

[12]The Massachusetts Child Support Guidelines (Guidelines) did not apply directly in this case because the combined gross income of the parties exceeded $135,000. However, as the judge recognized, the principles and definitions of the Guidelines were applicable to the child support determination. See Guidelines II(C), fourth par.

[13]The Massachusetts Child Support Guidelines that took effect on January 1, 2009 (New Guidelines), contain expanded guidance with respect to corporate income. The New Guidelines provide that "income is defined as gross income from whatever source *regardless of whether that income is recognized by the Internal Revenue Code* or reported to the Internal Revenue Service" (emphasis added). New Guidelines I.A. They further provide, as to business income:

"Income from . . . joint ownership of a partnership or closely-held corporation, is defined as gross receipts minus ordinary and necessary expenses required to produce income. In general, income and expenses from self-employment or operation of a business should be carefully reviewed to determine the appropriate level of gross income available to the parent to satisfy a child support obligation. In many cases this

how to treat the retained earnings of an S corporation that are passed through to a shareholder for purposes of measuring and imposing a child support obligation. In our view, the better reasoned decisions require a case-specific, factual inquiry and determination that is similar to that suggested by the new Massachusetts Child Support Guidelines (New Guidelines) discussed in note 13, *supra*.[14]

We follow the lead of these cases, and similarly conclude that a determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to meet a child support obligation must be made based on the

amount will differ from a determination of business income for tax purposes."

New Guidelines I.C. See ALI Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.14(1)(b) & comment b (2002) (defining business income as "gross receipts less expenditures required for the operation of the business," and noting that income available for child support may exceed income subject to tax). The New Guidelines thus suggest that, when setting child support, the judge should determine the income of an S corporation shareholder not by including automatically the pass-through income reported on the shareholder's tax return, but rather by making a specific determination about what portion (if any) of that pass-through income realistically and fairly is or should be deemed available to the shareholder for purposes of paying child support. The New Guidelines are consistent with a number of Massachusetts cases recognizing that actual business income available to meet child support obligations may not be the same as the income reported on a parent's tax return. See, e.g., *Smith-Clarke* v. *Clarke*, 44 Mass. App. Ct. 404, 406 (1998) (judge's decision to reject husband's reported business income and calculate gross income independently reasonable).

[14]See, e.g., *Zold* v. *Zold*, 911 So. 2d 1222, 1232-1233 (Fla. 2005) (*Zold*) (declining to set bright-line rule to determine whether undistributed pass-through income retained by S corporation should be considered available income for child support; factors to consider include extent shareholder has access to or control over undistributed, retained corporate income; purposes for which pass-through income retained by corporation; and extent of shareholder's interest in corporation); *Matter of the Marriage of Brand*, 273 Kan. 346, 359-360 (2002) (*Brand*) (concluding relevant factors for determining whether to include distributions from S corporations as available income for purposes of calculating child support obligation include, inter alia, past earnings history of corporation and shareholder's ability to control distribution or retention of profits); *Hubbard County Health & Human Servs.* v. *Zacher*, 742 N.W.2d 223, 228 (Minn. Ct. App. 2007) (*Hubbard*) (whether S corporation undistributed earnings is income to be determined on case-by-case basis; degree of shareholder's ownership and control relevant, not dispositive factor; necessary to consider whether undistributed earnings retained for legitimate business reason or to shield shareholder's income).

particular circumstances presented in each case. Such a fact-based inquiry is necessary to balance, inter alia, the considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds. See *Zold* v. *Zold*, 911 So. 2d 1222, 1232-1233 (Fla. 2005) (*Zold*); *Matter of the Marriage of Brand*, 273 Kan. 346, 357 (2002) (*Brand*).

Without undertaking to provide an exhaustive list, we note some relevant factors that the judge should weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for a child support obligation. First, a shareholder's level of control over corporate distributions — as measured by the shareholder's ownership interest — is a factor of substantial importance. See *Zold*, 911 So. 2d at 1233; *Hubbard County Health & Human Servs.* v. *Zacher*, 742 N.W.2d 223, 228 (Minn. Ct. App. 2007) (*Hubbard*). A minority shareholder lacking the power unilaterally to order a distribution may be relatively unlikely to have access to retained income of the corporation. See *Riepenhoff* v. *Riepenhoff*, 64 Ohio App. 3d 135, 138 (1990); *Roberts* v. *Roberts*, 666 N.W.2d 477, 483 (S.D. 2003). A majority shareholder may be relatively more likely to have access to retained funds and ability to manipulate pass-through income, and a sole shareholder even more so. See *Zold*, 911 So. 2d at 1232; *Brand*, 273 Kan. at 360. Cf. *Merola* v. *Exergen Corp.*, 423 Mass. 461, 464 (1996), quoting *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851 (1976) (majority interest in close corporation has "large measure of discretion in declaring or withholding dividends").

Second, the judge should evaluate the legitimate business interests justifying retained corporate earnings.[15] See *Zold*, 911 So. 2d at 1233; *Fennell* v. *Fennell*, 753 A.2d 866, 869 (Pa.

---

[15]Not all legitimate business interests will justify excluding retained earnings from a shareholder's income. A corporation may reasonably choose to retain income for at least two distinct purposes: maintaining the current business, or investing in and expanding the business. Earnings retained in order to maintain the business as currently operated should not be included in gross income. See New Guidelines (I)(C) (defining business income as "gross receipts minus ordinary and necessary expenses required to produce income"). Earnings retained in order to expand the business, on the other hand, have the

Super. Ct. 2000). Although the business judgment rule cannot shield the shareholder from the factual inquiry we describe here, even majority shareholders in a close corporation may be constrained by their duty of utmost good faith and loyalty to the minority shareholders. See *Bernier* v. *Bernier*, 449 Mass. 774, 787 (2007), quoting *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593 (1975).

Third, the judge should weigh affirmative evidence of an attempt to shield income by means of retained earnings. See, e.g., *Williams* v. *Williams*, 74 Ohio App. 3d 838, 843-844 (1991); *Fennell* v. *Fennell*, 753 A.2d at 869. In that regard, the corporation's history of retained earnings and distributions may be relevant. See *Tebbe* v. *Tebbe*, 815 N.E.2d 180, 184 (Ind. Ct. App. 2004); *Brand*, 273 Kan. at 359.

Finally, it is important to consider the allocation of burden of proof in relation to the treatment of an S corporation's undistributed earnings for purposes of determining income available for child support; this is an issue on which courts in other jurisdictions are split. Some courts shift the burden of proof depending on the shareholder's level of control over the corporation: a minority shareholder is presumed not to have access to retained income and therefore does not carry the burden of proof, while a majority or sole shareholder is presumed to have access to retained income and does carry the burden of proof. See, e.g., *Brand*, 273 Kan. at 354; *Fennell* v. *Fennell*, 753 A.2d at 869. See also *Tebbe* v. *Tebbe*, 815 N.E.2d at 183 & n.5 (indorsing *Fennell* case in dicta). Other courts place the burden on the shareholder to present evidence that he or she does not have access to retained income regardless of the shareholder's ownership percentage in the corporation; they reason that the shareholder is the party with greater access to the evidence. See, e.g.,

potential of increasing the business's value and thus the shareholder's personal net worth, and might properly be viewed as income available for child support — just as a distribution invested in another corporation would be. Cf. *Merrill* v. *Merrill*, 587 N.E.2d 188, 191 (Ind. Ct. App. 1992) (Indiana guidelines include retained earnings); *Brand*, 273 Kan. at 355 (scrutiny warranted where payments on corporate debt increase personal net worth). But see *Fennell* v. *Fennell*, 753 A.2d 866, 867, 869 (Pa. Super. Ct. 2000) (income retained for investment not available for child support, where minority shareholder lacked control over distributions).

*Zold,* 911 So. 2d at 1233; *Walker* v. *Grow,* 170 Md. App. 255, 281 (2006); *Hubbard,* 742 N.W.2d at 228. We are persuaded that the second approach is more appropriate, because we agree that regardless of the percentage of his or her ownership interest, the shareholder is likely to have greater access to relevant information about the corporation than a party who is not connected to it.

We return to the case before us. The record plainly reflects that the judge deemed, without giving any specific consideration to particular facts or circumstances, the father's entire income as measured for income tax purposes as available income for purposes of determining an appropriate child support order.[16] The record also reflects, however, that at the trial itself, the parties and the judge gave virtually no consideration to the issue of how the father's pass-through income should be treated in relation to child support. In the circumstances, remand is appropriate to allow for further consideration of the father's financial resources and the child support order in light of the standard we set out in this opinion (as well as the New Guidelines).[17,18]

c. *Legal fees.* The father challenges the judge's order that he pay a portion of the mother's legal fees.[19] "Such an award is

[16]On appeal, the mother has argued in favor of the approach used by the judge, while the father contends that none of the corporation's undistributed earnings should be considered as part of his available income for child support purposes because he actually received none of it. We reject both all-or-nothing positions.

[17]For reasons discussed in the text *supra,* on remand, the father will bear the burden of proving that his percentage share of the corporation's undistributed earnings is not available to him in whole or in part in order to meet a child support obligation.

[18]An additional issue that may come into play on remand is whether a distribution from an S corporation made solely to cover a shareholder's tax liability for retained income should be included in calculating the shareholder's available income for child support purposes. Courts in several jurisdictions have held that the portion of a distribution designated to pay taxes on earnings legitimately retained by the corporation is not available to a shareholder parent to satisfy a child support obligation. See *McHugh* v. *McHugh,* 702 So. 2d 639, 642 (Fla. Dist. Ct. App. 1997); *Tebbe* v. *Tebbe,* 815 N.E.2d 180, 184 (Ind. Ct. App. 2004); *Walker* v. *Grow,* 170 Md. App. 255, 280-281 (2006). We agree in general with the reasoning of these decisions but express no opinion concerning this particular case.

[19]The judge did not specify under what authority she awarded legal fees. General Laws c. 209C, governing custody of children born out of wedlock, does not contain a specific provision for fee shifting. However, the statutory

within the sound discretion of the judge and will not ordinarily be disturbed." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 38-39 (2002). In this case, the judge concluded that a fee award was justified because the litigation was "unnecessarily complicated and prolonged" by the actions of the father — in particular by the father's conduct during discovery, his "relentless pursuit of information and unsubstantiated allegations" against the mother, and the large amount of extraneous information produced by the father during litigation. The judge had an opportunity to observe the parties through extended pretrial discovery and motion practice as well as trial, and also had before her a detailed itemization of the mother's attorney's fees. The order that the father pay $100,000 of the mother's $365,000 in attorney's fees was within the judge's discretion. See, e.g., *Silverman* v. *Spiro*, 438 Mass. 725, 730 (2003) (partial fee award demonstrated consideration of countervailing factors); *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 159 (1996) (deferring to judge's "considerable discretion" based on "intimate familiarity" with parties' circumstances and husband's superior financial position).

3. *Conclusion.* The judgment of the Probate and Family Court on the plaintiff's complaint for custody is affirmed with the exception of Paragraphs 5 through 9, which concern child support. The order on child support in Paragraphs 5 through 9 is vacated, and the matter is remanded to the Probate and Family Court for further consideration and orders solely on the issue of ability to pay child support and consistent with this opinion. The separate judgment on the plaintiff's motion for attorney's fees and costs is affirmed.

*So ordered.*

---

authority to shift fees in marital custody disputes, G. L. c. 208, § 38, has been read to extend to nonmarital children. See *G.E.B.* v. *S.R.W.*, 422 Mass. 158, 174 n.15 (1996); *Doe* v. *Roe*, 32 Mass. App. Ct. 63, 68-69 (1992).