JOANN CAVENEY *vs.* THOMAS J. CAVENEY.

No. 10-P-599.

Essex. May 11, 2011. - January 12, 2012.

Present: KAFKER, GRAHAM, & MILKEY, JJ.

*Divorce and Separation,* Division of property, Alimony, Attorney's fees. *Corporation,* Close corporation, Valuation. *Practice, Civil,* Contempt, Attorney's fees. *Contempt.*

At a divorce trial, the judge did not abuse her discretion or err in accepting the wife's use of a valuation date to establish the value of certain of the wife's business interests that was later than the date recommended by the discovery master, based on changes in the economic climate, where the husband had sufficient opportunity to prepare for cross-examination. [106-108]

The judge in a divorce action did not err in adopting a valuation of the wife's expert witness of certain of the wife's business interests using an asset-based approach rather than an income-based approach, where the judge's reliance on the asset-based valuation was neither unreasonable nor materially at odds with the totality of the circumstances [108-110]; however, the judge erred in adopting so much of the valuation of the wife's expert as applied a marketability discount, where, given that the sale of the businesses was not presently anticipated, such a discount unfairly deflated the value of the companies [110-112]; further, the judge erred in adopting so much of the valuation of the wife's expert as applied a minority discount, given the absence of extraordinary circumstances, and that a sale of the businesses was not presently anticipated [112-113].

In a divorce action, in which the judge assessed the husband with an advance of one-half the sum of funds that were depleted from checking and retirement accounts, the judge did not err in concluding that the husband had dissipated the marital estate. [113-114]

The judge in a divorce action did not err in valuing certain loans made by the husband to businesses in which he held ownership interests at full face value when apportioning the loans to the husband as a portion of his share of the marital assets. [114-115]

This court declined to consider a terse and conclusory argument made by the husband in a divorce action concerning the judge's division of marital property that did not rise to the level of appropriate appellate argument. [115]

This court declined to disturb the award of alimony to the wife made by the judge in a divorce action, where it was clear from the findings, viewed in their entirety, that the judge had in mind in fashioning the alimony award

the present circumstances of the wife and her business interests and the undisputed evidence that the businesses had been severely affected by an economic downturn. [115-117]

This court declined to set aside a judgment of civil contempt arising from the husband's failure to comply with various provisions of a judgment of divorce, in which the judge ordered that the husband be committed to jail for ninety days until he purged himself of contempt by paying a certain amount to the wife, where the judge fixed a purge amount and found expressly that the husband had the ability to pay it. [117-118]

This court declined to disturb an award of attorney's fees to the wife in a divorce action. [118]

This court denied the requests for appellate attorney's fees made by the wife and the husband in the husband's consolidated appeals from judgments of divorce and civil contempt. [118]

COMPLAINT for divorce filed in the Essex Division of the Probate and Family Court Department on June 30, 2006.

The case was heard by *Mary McCauley Manzi,* J., and a complaint for contempt, filed on March 4, 2010, was also heard by her.

*Robert S. Wolfe* for Thomas Caveney.

*William Sanford Durland, III,* for Joann Caveney.

GRAHAM, J. Following a lengthy trial on the former wife's complaint for divorce, a judge of the Probate and Family Court awarded the wife primary physical custody of the parties' two minor children, divided the parties' assets, and ordered the former husband to pay to the wife alimony in the amount of $940 per week and child support in the amount of $500 per week. The judge later found the husband in civil contempt for failure to comply with certain provisions of the divorce judgment. In these consolidated appeals from the divorce judgment, as amended, and the contempt judgment,[1] the husband challenges, among other things, the property division and the alimony award, as well as the judge's decision to find him in contempt. As we agree with the husband that the judge erred in the valuation of the wife's business interests, we remand the matter to the Probate and Family Court for further proceedings. In all other respects, we affirm the divorce judgment, as amended. We also affirm the judgment of contempt.

---

[1]The husband also appealed from an order of the single justice of this court denying his motion for stay. As the husband has not argued the appeal in his brief, we deem it waived.

A. *The divorce action.* 1. *Background.* The parties were married in June, 1993, and separated in July, 2005. Two children were born of the union.

The husband was born in 1960 and is in good health. He is a principal/salesman at New England Technical Sales (NETS) where his base salary is $100,000 per year. The husband owns fifty percent of the shares in NETS; his brother owns the remaining shares. The husband is also an owner (forty percent of the shares) and the vice president of sales and marketing at a corporation known as Online Marketing Solutions, Save Harbor, Inc. (OMS).[2] He does not currently draw a salary from OMS. The parties stipulated that the fair value of the husband's interest in NETS is $21,000 and the fair value of his interest in OMS is $71,000. The judge also found that the husband has made loans to NETS and OMS in the amount of $675,000 and that the "loans receivable" from NETS and OMS are assets subject to division.

Although the judge found that the husband's base salary from NETS is approximately $100,000 per year, she stated that the husband's "true income" is approximately $200,000 per year. The judge noted that the husband's companies consistently pay for the rental payments on his personal residence, the mortgage payment on property that he owns with his brothers in New Hampshire, and numerous other miscellaneous personal expenses not accounted for as income on his financial statements. Indeed, the judge found that "[t]hroughout the proceedings, the husband has been less than forthcoming with his financial data, less than accurate in his financial disclosures, and consequently, less than credible in his testimony to the Court."

The wife was born in 1962 and is in good health. She holds a master's degree in science education, and at the time of trial, was employed as a part-time biology teacher earning $8,450 per year. Her employment is not guaranteed.

The wife has ownership interests (24.75 percent of the nonvoting stock) in three closely held S corporations: Scarfo Construction, Inc. (Scarfo Construction); Liberty Manor, Inc. (LMI); and

---

[2]The husband's brother owns forty percent of the shares in OMS; an unrelated third person owns the remaining twenty percent of the shares.

Liberty Homes, Inc. (LHI).[3] These interests were given to the wife by her father, who gave identical ownership interests to each of the wife's three sisters.[4] The wife's father owns one percent of each of the companies; his shares are the voting stock. The judge adopted the values of the wife's interests in the companies "as determined by the expert testimony she offered" and "based on the sound and thorough analysis detailed in the oral and documentary evidence submitted." More specifically, the judge found that as of December 31, 2008, the wife's interest in Scarfo Construction was valued at $291,000 and that her interest in LMI and LHI was worth $75,000.[5]

The judge found that both parties had made significant contributions to the value and appreciation of the total marital estate, which the judge valued at $2,068,049. While the husband was the primary income earner during the marriage, the wife made substantial contributions to the marital estate through the generous and regular financial gifts she received from her parents and the interests she acquired in the family corporations. The wife was also the primary homemaker and caretaker for the parties' children.

During the marriage the parties enjoyed a "high station in life" which included an expensive home, domestic help, luxury cars, country club memberships, and frequent vacations.[6] Since the parties' separation, however, the wife has been unable to

---

[3]Scarfo Construction's work includes site excavation and subdivision development. LMI is engaged in developing a tract of land in western Massachusetts into a manufactured home community for persons over the age of fifty-five. LMI leases home sites. LHI sells manufactured homes to be installed at LMI. Scarfo Construction provides all the management services for LMI and LHI.

[4]The wife's father testified that his decision to make his children shareholders in the three companies "was estate planning so that [he] could leave [his] inheritance to [his] four daughters."

[5]The husband's business expert, using a June 30, 2008, valuation date, concluded that the wife's 24.75 percent interest in Scarfo Construction was worth $606,500, her 24.75 percent interest in LMI was worth $824,000, and her 24.75 percent interest in LHI was worth $871,500. The judge rejected the husband's expert's opinions of value.

[6]During the marriage, the husband, his brother, and a third party also had ownership interests in a high-tech corporation called On Demand Solutions, Inc. (ODS), which they formed in 1996. ODS was sold in 1998 for $7.5 million. The husband's brother testified that most of the purchase money was "made up of restricted stock."

maintain her preseparation lifestyle and has been forced to cut back on many of her expenses. The judge found that the husband's station had "essentially remained the same post separation."

On these findings and others, the judge determined that each party should receive one-half of the total marital estate, or $1,034,024. Noting that the assets assigned to the husband totaled $1,294,167,[7] and the assets assigned "thus far" to the wife totaled $773,882,[8] the judge ordered the husband to pay to the wife the sum of $260,142 to achieve an equal division of the marital estate. As we have stated, the judge also ordered the husband to pay the wife child support in the amount of $500 per week and alimony in the amount of $940 per week. In addition, the judge ordered the husband to pay the wife $175,000 for legal fees and costs. The husband's motion to stay the judgment was denied.[9]

2. *Valuation of wife's business interests.* The husband challenges on numerous grounds the judge's findings with respect to the values of Scarfo Construction, LMI, and LHI.

a. *Valuation date.* Contrary to the husband's assertion, the judge did not abuse her discretion and commit reversible error by "misconstru[ing] the decision of the [d]iscovery [m]aster and alter[ing] valuation dates in the middle of trial." In her third supplemental report dated November 7, 2008, the discovery master "recommend[ed]" that both parties "shall" use June 30, 2008, as the date for valuation of all businesses which are the

---

[7]The major assets assigned to the husband include the husband's forty percent interest in OMS ($71,000) and fifty percent interest in NETS ($21,000); the loans receivable from NETS and OMS ($675,000); the husband's interest in a New Hampshire property ($91,667); a Smith Barney account; and the cash value of a life insurance policy ($128,000). The judge also assessed as an advance to the husband the sum of $107,500, representing funds "depleted from the marital estate." In addition, the judge treated the withdrawal by the husband of $200,000 from a Smith Barney SEP IRA without leave of court or consent of the wife as an advance to the husband.

[8]The major assets assigned to the wife were the former marital home (equity value $282,000); the wife's interests in Scarfo Construction ($291,000) and LMI and LHI ($75,000); and the entire balance of the husband's Smith Barney simplified employee pension individual retirement arrangement (SEP IRA) account (approximately $121,000).

[9]In February, 2010, the parties filed a stipulation to amend the judgment on grounds not relevant here. The stipulation was approved by the court and the judgment was amended accordingly.

subject of this litigation. The discovery master afforded each party, however, the opportunity to seek a different valuation date upon submission of an affidavit no later than January 5, 2009, alleging a material change in circumstances.

By affidavit dated January 5, 2009, the wife's business expert described the changes in the economic climate since June 30, 2008, including the precipitous fall in the real estate market, and the effect of those changes on Scarfo Construction, LMI, and LHI which were "heavily reliant on the current economic climate." The wife's expert stated that a valuation date of June 30, 2008, would not be as appropriate as utilizing a date much closer to the scheduled date of trial. The question of the date of the valuation was referred by the master to the judge who, apparently, did not reach the issue prior to trial.

At a hearing on a motion in limine, which took place on February 13, 2009 (at the start of the second day of trial), the judge stated:

> "A couple things have to be noted here — to decide this motion . . . [I]t's very true that the discovery master gave each side — both sides — the opportunity to select the date of December 31st instead of June 30th.

> "Whoever chooses not to do that, you do so — I think in this economy — at your peril because I don't think you have to be any kind of expert in any of these matters to know that individuals on a common sense basis whether it's corporations that do what Scarfo Corporation does or Liberty Manor or Liberty Homes, there are very few entities that wouldn't take a value back in June as opposed to a value of 12/30."

It is apparent from the foregoing that the judge did not simply alter the valuation dates midtrial, but rather recognized that the husband had followed the protocol set out by the discovery master for establishing a change in the valuation date. Based on the changes in the economic climate, the judge indicated that it was reasonable and proper for the wife to utilize a valuation date of December 31, 2008. To the extent the husband claims that he first received the wife's business valuations shortly before trial and that he should have known in advance "the

opinions of experts engaged by the opposing party for purposes of preparing cross examination and rebuttal expert testimony," it is to be noted that the wife's experts did not testify until the third day of trial on April 1, 2009. The husband had sufficient opportunity to prepare for cross-examination.[10]

b. *The valuation methodologies.* The husband argues that the judge erred in her valuation of the wife's companies "[b]y [u]tilizing [f]lawed [v]aluation [m]ethodologies [t]hat [f]ailed [t]o [c]omply [w]ith [g]overning [p]recedents."

The judge, as we have indicated, adopted the values of the wife's interests in Scarfo Construction, LMI, and LHI based upon the testimony of the wife's experts. In valuing the wife's 24.75 percent interest in the three companies, the wife's business expert, Steven B. Boyles,[11] utilized a "fair value standard."[12] Continuing, Boyles stated that there are three standard approaches to business valuation: the assets approach, the income approach, and the market approach. He determined that the assets approach and, more particularly, a form of that approach called the "adjusted net asset method," was most appropriate. Boyles

---

[10]Similarly, to the extent the husband asserts that he was "ambushed" upon learning of a stock purchase agreement (which contains, among other things, provisions concerning voluntary and involuntary lifetime transfers of stock by shareholders, and grants the company the option to purchase all of the shares of stock that stockholder desires to transfer) the judge provided him with time to explore that document.

[11]As for the husband's attempt to challenge now the qualifications of the wife's business appraisal expert (Boyles) and her real estate expert (James F. Fisher), the husband's counsel stated specifically at trial that he had no objection to the witnesses being qualified as experts in their respective fields, and the witnesses were so qualified by the judge.

[12]Boyles indicated that at the direction of one of the wife's previous attorneys, he utilized a "fair value" standard. He understood that "term to represent the value based upon actual facts of the matter and not on a hypothetical buyer and seller as is the case under fair market value." Compare *Bernier* v. *Bernier*, 449 Mass. 774, 779 n.8 (2007) (*Bernier*), quoting from *Gross* v. *Commissioner of Int. Rev.*, 272 F.3d 333, 344 (6th Cir. 2001), cert. denied, 537 U.S. 827 (2002) (noting that "fair market value" is generally defined as "the 'price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts' "). The husband's business expert, Bernard L. Caniff, Jr., also employed a "fair value" standard which he defined "in simple forms" as fair market value without discounts. He understood that that standard was called for by *Bernier*, discussed more fully, *infra*.

explained that the adjusted net asset method "takes the book value of the assets, writes those assets up to market, what they could be sold for in the marketplace — not liquidated but sold in a reasonable time frame — and subtracts all liabilities associated with them."[13]

With respect to Scarfo Construction, Boyles determined that the wife's 24.75 percent prediscounted interest was valued at $489,386. He then applied a fifteen percent discount for lack of control and a thirty percent discount for lack of marketability which resulted in an after discount fair value of $291,000. With respect to LMI and LHI, Boyles combined the two companies into one entity for valuation purposes, adjusted their assets to fair value based on the real estate appraisals of the wife's expert and "subtracted out" liabilities. After making certain intercompany adjustments, Boyles determined that the prediscount value of the wife's 24.75 percent interest in LMI and LHI was $126,599. Applying a fifteen percent discount for lack of control and a thirty percent discount for lack of marketability, Boyles opined that the fair value of the wife's interest in the two companies was $75,000.

In *Adams* v. *Adams*, 459 Mass. 361, 380-381 (2011) (*Adams*), the court set out certain of the principles applicable to a judge's valuation of business interests:

> "Valuation of a business interest is a question of fact. . . .
> The standard of review to be applied is whether the judge's findings were clearly erroneous . . . . When the opinions of valuation experts diverge, a judge may 'accept one reasonable opinion and reject the other.' . . . The judge may also 'reject expert opinion altogether and arrive at a valuation on other evidence.' . . . The judge 'may not, however, reach a valuation that is materially at odds with the totality of the circumstances or, in the case of divorcing spouses, at variance with the requirements of the

---

[13]Unlike the asset approach, "[t]he income approach rests on the proposition that '[i]n theory, the value of a business or an interest in a business depends on the future economic benefits that will accrue to that business, with the value of those future benefits being discounted back to present value at some appropriate discount rate.' " *Adams* v. *Adams*, 459 Mass. 361, 381 (2011), quoting from Pratt & Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 175 (5th ed. 2008).

equitable distribution statute.' G. L. c. 208, § 34. *Bernier* [v. *Bernier*, 449 Mass. 774, 785 (2007) (*Bernier*)]."

The husband argues that Boyles, and consequently the judge in relying on Boyles's testimony and documentation, erred in utilizing the "asset approach," rather than an income-based approach, in appraising the three corporations. At the outset, Boyles testified, and his report states, that although he ultimately utilized the adjusted net asset method of valuation, he considered the income approach with respect to each of the companies but determined that that approach did not provide a meaningful result.[14] While it has been stated that "[t]he consensus approach to valuation deployed by appraisers and experts in marriage dissolutions has coalesced around some variation of what is known as the 'income approach,' " *id.* at 381, we do not think a judge is necessarily precluded from relying on an asset-based valuation. On the evidence presented, and particularly the testimony and report of Boyles describing why the asset approach was preferable to the income approach in the valuation of the wife's business interests, the judge's reliance on the asset-based valuation was neither unreasonable nor "materially at odds with the totality of the circumstances" and cannot be said to be clearly erroneous. *Id.* at 380-381. It is to be noted that the husband's expert, Bernard L. Caniff, Jr., also utilized an asset-based approach in valuing the wife's interest in the three companies, albeit as a base line valuation.

The husband challenges, as contrary to the teachings of *Bernier*, the judge's adoption of business valuations that contain "lack of control" and "marketability" discounts. In *Bernier*, the court stated, as a "preliminary matter," that "where valuation of

---

[14]Boyles testified, inter alia: "The economy has driven the income approach sort of out of favor related to these types of businesses, these businesses being very asset heavy, have a lot of value in those assets. The income approach is based on the earning stream. In the economic climate that we're in and the industry that they're in, the earning stream can be projected going forward, but the risk of tainting those earnings is higher now, so it drives the value down below what you could attain from just the assets themselves." Contrary to the husband's suggestion, Boyles made clear at trial that his decision to utilize an asset-based approach was not based exclusively on Rev. Ruling 59-60, 1959-9 I.R.B., which makes reference to the valuation of the stock of a closely held investment or real estate holding company.

assets occurs in the context of divorce, and where one of the parties will maintain, and the other be entirely divested of, ownership of a marital asset after divorce, the judge must take particular care to treat the parties not as arm's-length hypothetical buyers and sellers in a theoretical open market, but as fiduciaries entitled to equitable distribution of their marital assets." *Bernier*, 449 Mass. at 775-776. The court determined that, in the circumstances of that case, the judge erred in adopting the husband's expert's "marketability" discount. *Id.* at 791-792.

> "[A] marketability discount 'adjusts for a lack of liquidity in one's interest in [a closely-held corporation], on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation.' . . . As [the husband's expert] testified, and the judge found, a marketability discount is 'the ability to convert the subject company to cash.' This discount was not warranted in light of the husband's testimony negating any possibility of a sale. . . . The subject companies will continue as going concerns and are not being converted to cash. '[N]either marketability nor a minority discount should be applied absent extraordinary circumstances. . . . Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other share-holders who want to keep the business in the form of a close corporation.' *Brown* v. *Brown*, 348 N.J. Super. 466, 474-476 (2002). Applying a marketability discount in light of the husband's intended, and presumed, acquisition of the Supermarkets unfairly deflated their value."

*Bernier, supra* at 792.

The husband argues that in the circumstances presented here, and where a sale of Scarfo Construction, LMI, and LHI is not imminent, the judge erred by failing to adhere to the standards articulated in *Bernier* when it adopted the opinion of Boyles. The wife, while acknowledging that a sale of the businesses is not imminent,[15] argues that *Bernier* is distinguishable in that the wife has no control over the businesses, and practically speaking,

---

[15]Both Boyles and Caniff also testified that it was not anticipated that the businesses would be sold at the present time.

"cannot sell, transfer or pledge her shares in the businesses" and cannot convert them into cash.[16] The wife asserts that the judge's adoption of a discounted value of the wife's interests was thus warranted.

While we agree with the wife that there are factual differences between *Bernier* and the case at bar, the principles espoused in *Bernier* concerning the valuation of closely held businesses in the divorce context convince us that the judge erred in the instant matter in adopting the discounted values of the wife's interests. As to the marketability discount, here, as in *Bernier*, the sale of the businesses (and the wife's interests therein) is not anticipated at the present time and the companies will not be converted to cash. In the circumstances, liquidity, a hallmark of the marketability discount, is of "little consequence." *Brown* v. *Brown*, 348 N.J. Super. at 488. To apply the marketability discount in the circumstances presented here would, we think, "unfairly deflate[]" the value of the companies. *Bernier*, 449 Mass. at 792.

A "minority" or lack of control discount "recognizes that controlling shares are worth more in the market than are non-controlling shares" and that "[m]arketability problems often affect shares of closely held corporations." *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650, 678 (1997), quoting from 12B Fletcher, Cyclopedia of Private Corporations § 5906.120, at 435, 436 (1993).[17] Although a minority discount was not specifically at issue in *Bernier*, the court, through dictum, made clear that such a discount "should not be applied absent extraordinary circumstances." *Bernier*, 449 Mass. at 792, quoting from *Brown* v. *Brown*, 348 N.J. Super. at 483. But see *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 862-864 (1989) (a pre-*Bernier* case). Again, as a sale of the businesses is not presently anticipated, and in the absence of what we would perceive as extraordinary

---

[16]We note that the stock redemption agreement envisions the possible sale of stock by a shareholder, albeit subject to certain restrictions.

[17]One court has stated that while a " 'marketability discount' reflects the theoretically limited market for the sale of a privately-held, small business," a " 'minority discount' reflects a theoretically more limited market for sale of a non-controlling interest in such a business." *Brown* v. *Brown*, 348 N.J. Super. at 487-488. "Both discounts represent an attempt to account for the fact that unlike shares in a publicly-traded company, shares in a closely-held corporation have limited liquidity." *Id.* at 488.

circumstances, it was error for the judge to adopt a valuation for the wife's interest in the businesses which utilizes a lack of control discount.

There is nothing in the husband's remaining contentions that would cause us to disturb further the judge's valuation methodologies with respect to the wife's interests in Scarfo Construction, LMI, and LHI.[18]

3. *Dissipation.* At the time of the parties' separation in July, 2005, the husband had a Smith Barney checking account (balance of $215,845) into which he deposited his paychecks and from which he paid the mortgage and other marital expenses as well as his own personal expenses (including expenses attributed to his high station lifestyle, and counsel fees).[19] The husband also maintained a Smith Barney simplified employee pension individual retirement arrangement (SEP IRA) account. The husband acknowledged that by 2008 the monies in his Smith Barney checking account had been generally depleted, and he withdrew $50,000 from the IRA in March, 2008, and $150,000 in August, 2008, and deposited the monies in his Smith Barney checking account.

The judge denied the wife's request to credit the husband with an advance of $215,000 for the funds he spent from the Smith Barney checking account, noting that some of the funds

---

[18]The husband challenges, for example, aspects of the methodology used by the wife's real estate expert, Fisher, in valuing the property being developed by LMI. Fisher opined that the estimated market value of the land and real estate improvements (but not offset by debt) was $2.5 million. The husband's real estate expert, Jerome C. Franklin, who valued the property as of June 30, 2008, and December 31, 2008, opined that the fair market value of the property as of the former date was $3 million and as of the latter date was $2.55 million. Indeed, Franklin testified that his December appraisal and the appraisal of Fisher at approximately the same time were "pretty similar in the methods used." "I came in at $2,550,000. He came in at $2,500,000. Two weeks apart on an effective date seems pretty good to me." The husband's business expert, Caniff, relied on Franklin's appraisal as of June 30, 2008.

The husband also takes issue with the methodology of Boyles in valuing LMI and LHI as a single entity. Boyles explained his reasons for treating the companies as a single entity, including the fact that the companies were fundamentally intertwined. While the husband notes that his experts disagreed with Boyles, he points to no authority that would preclude such an approach.

[19]The husband acknowledged that his expenses included costs associated with various vacations, trips to Foxwoods Casino, and concert tickets.

were used to pay the mortgage and other marital expenses. The judge found it reasonable, however, to assess an advance of one-half that sum ($107,500) for funds depleted from the marital estate. The judge treated the withdrawal by the husband of $200,000 from the Smith Barney IRA, without leave of court or consent of the wife, as an advance to the husband.

In view of the judge's findings, for example, that the husband used the financial resources of the marital estate to maintain a high lifestyle for himself (while the wife's standard of living was substantially reduced), we cannot say that the judge erred in concluding that the husband had dissipated the marital estate. To the extent the husband claims that the judge engaged in some form of double dipping vis-à-vis his checking and IRA accounts, the husband's own testimony indicates that he depleted the assets in the checking account *prior* to the funding of that account with money from the IRA.

4. *Inequitable division of property.* The husband takes the position that the judge's orders for division of property leave the parties "in vastly disparate circumstances," and, essentially, impoverish him. A primary thrust of the husband's argument is that notwithstanding the parties' stipulation that the husband's ownership interests in OMS and NETS had a combined value of $92,000 (and other testimony with respect to the businesses), the judge rejected his testimony that the loans he made to OMS and NETS in the amount of $675,000 were now worthless. The husband appears to assert that the judge erred in valuing the loans at their full face value when apportioning the loans to him as a portion of his share of the marital assets.

The parties stipulated concerning the value of the husband's business interests on June 11, 2009. On his financial statement filed in February, 2009, the husband listed "Notes Held" with respect to OMS and NETS with a value of zero. The judge found that this representation was "clearly false." On subsequent financial statements filed on June 3, 2009, and July 28, 2009 (filed after the parties' stipulation), the husband listed "Notes Held" in the amount of $675,000 reflecting loans he had made to the companies. It is noteworthy that the husband included the full value of the notes in determining the total value of his assets. The judge found that the representations on these financial statements state the accurate amount of the loans due the husband.

Although the husband testified that he did not consider the $675,000 as money OMS and NETS owed him but rather as monies he simply had invested in the businesses,[20] the judge clearly did not credit that testimony. In view of the foregoing, and the evidence that OMS and NETS had, in recent years, repaid various loans,[21] we fail to discern error.

The husband's terse and conclusory assertions in his principal brief that certain distributions amounting to over $1 million reflected on the Internal Revenue Service schedule K-1 (K-1) forms filed by the wife's S corporations between 1998 and 2008, but which the judge determined the wife did not actually receive,[22] *had* to be treated as loans by the wife to the corporations and recognized as marital assets to be divided equitably[23] does not rise to the level of argument contemplated by Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1925).[24] Cf. *Poras v. Pauling*, 70 Mass. App. Ct. 535, 546 (2007).

5. *Alimony.* In her findings in support of the alimony award

[20]The husband stated, "I would love that to be paid back, but that is a big, big risk that may not happen now."

[21]There was evidence, for example, that OMS and NETS repaid the husband's brother/business partner hundreds of thousands of dollars between 2005 and 2008 for certain loans.

[22]The husband asserts that the judge adopted the testimony of the wife that she "never saw the money." The wife, the wife's father, and the certified public accountant who did the accounting work for Scarfo Construction testified that Scarfo Construction generally made distributions to its shareholders for the purpose of reimbursing them for income taxes (and, at times, life insurance) that would be attributed to them as a result of having the income of the companies pass through to them. See *J.S.* v. *C.C.*, 454 Mass. 652, 660 n.10 (2009) ("When a small business corporation elects to be an S corporation, its earnings or income is not taxed at the corporate entity level but is passed through and taxed to the individual shareholders on a pro rata basis, determined by each shareholder's percentage ownership interest in the corporation; the pass through occurs whether or not the income is actually distributed"). The wife testified that she did not otherwise receive any of the profits of Scarfo Construction.

[23]The judge ultimately did not list as a marital asset any "loans" from the wife to the corporations.

[24]We note that the wife responded to the husband's argument in an equally cursory manner in her brief (in which she asserted that any undistributed K-1 income remaining after the payment of taxes did not become a "loan due," but rather became "retained earnings"). In his reply brief, the husband attempts to flesh out his position. In doing so, he raises certain points, and cites to new authorities, that were not mentioned or explored in his principal brief.

in the amount of $940 per week, the judge stated that the wife
had the requisite need and the husband had the requisite ability
to pay alimony to approximate the standard of living enjoyed
by the parties during the marriage. See generally *Grubert* v.
*Grubert*, 20 Mass. App. Ct. 811, 819 (1985). The judge further
stated that there was no evidence to suggest that the actual
amount of distributions made to the wife from the subchapter S
corporations bore any resemblance to the amount of K-1 income
reported by the wife for income tax purposes. Indeed, the judge
found that the wife's annual income is approximately $8,450
from her employment. The judge noted that "the wife's 24.75
[percent] interests in each of the family businesses . . . may
eventually generate income to [the] Wife to a greater degree
than they presently do, and the Husband may, in the event that
a material change in circumstances occurs, seek a modification
of the current alimony and or child support orders."

The husband asserts that although the K-1 forms indicate that
between 1998 and 2008[25] there were substantial distributions of
K-1 income to the wife from Scarfo Construction, the judge
made no findings as to what happened to the distributions reported
or "the form or 'value' " of their reinvestment in the companies.[26]
He requests that we remand the matter for further findings and
consideration in the light of the "ground rules" set out in *J.S.* v.
*C.C.*, 454 Mass. 652, 661-664 (2009) (listing some relevant fac-
tors that a judge should weigh in determining what portion, if
any, of undistributed corporate earnings may be available to a
shareholder for child support obligations). See *Halpern* v. *Rabb*,
75 Mass. App. Ct. 331, 335-337 (2009).

It is clear from the findings, viewed in their entirety, that the
judge had in mind in fashioning the alimony award the present
circumstances of the wife and the businesses and the undisputed
evidence that the businesses had been severely affected by the
economic downturn. In fact, the certified public accountant who
has long done the accounting work for Scarfo Construction

---

[25]During most of this period the parties were married and living together.

[26]The husband notes in his brief that the judge made reference in her find-
ings to a financial statement in which the wife listed "royalties" and explained
that those royalties were "[r]einvested into Scarfo Construction" and the
distributions were not actually received by her.

testified that he anticipated that there would be no distributions for tax purposes for 2009 as the companies collectively operated at a loss. In the circumstances, we decline to disturb the judge's order for alimony.

B. *The contempt action.* In March, 2010, the wife filed an amended complaint for civil contempt alleging that the husband had failed to comply with various provisions of the divorce judgment, including the orders to pay the wife $175,000 for legal fees and $260,142 to equalize the marital assets. After a hearing,[27] the husband was adjudged guilty of contempt for failing to pay the above sums (as well as his failure to transfer the balance of his Smith Barney IRA to the wife). The judge found specifically that the husband had the present ability to pay the amount of $260,142. She ordered that the husband be granted an additional sixty days to pay the legal fees of $175,000. The husband was also assessed $3,350 in additional attorney's fees. The judge ordered that the husband be committed to jail for ninety days until he purged himself of the contempt by the payment of $263,492. After the husband's motion for stay was denied, he was incarcerated for ninety days.

In order to find a defendant in civil contempt there must be a clear and unequivocal command and an equally clear and undoubted disobedience. *Larson* v. *Larson*, 28 Mass. App. Ct. 338, 340 (1990). *Whelan* v. *Frisbee*, 29 Mass. App. Ct. 76, 82 (1990). *Poras* v. *Pauling*, 70 Mass. App. Ct. at 539-540. "In addition, the defendant must be found to have the ability to pay at the time the contempt judgment enters." *Larson* v. *Larson*, *supra* at 340. Furthermore, "[a] person judged in civil contempt may not be sentenced to prison for failure to pay a compensatory sum of money if he shows that he is unable to comply." *Salvesen* v. *Salvesen*, 370 Mass. 608, 611 (1976).

The husband argues briefly that the judge erred in adjudging him in contempt and confining him to jail for ninety days as the judge failed to find as a fact that he had in excess of $400,000 to comply with the orders. The husband's argument misses the mark in that the judge, as we have discussed, fixed the purge amount at $263,492 and found expressly that the husband had

[27]At the hearing, the husband's counsel agreed with the judge that absent a stay, each of the parties is entitled to the enforcement of the judgment.

the ability to pay that amount. For this reason, if no other, we decline to set aside the contempt judgment.

C. *Attorney's fees.* In a two sentence "argument," the husband asserts that the judge erred in awarding attorney's fees to the wife. He claims that in light of the need to reconsider "much" of the judgment and amended judgment, the fee award should be vacated and revisited during reconsideration of the case. Passing the question whether the husband's terse assertions rise to the level of reasoned appellate argument, as we are affirming the contempt judgment and vacating the divorce judgment, as amended, in only limited respects, we perceive no reason to disturb the award of attorney's fees.

D. *Appellate attorney's fees.* The wife *and the husband* have requested that they be awarded attorney's fees and costs pursuant to Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979).[28] Their requests are denied.

E. *Summary.* We vacate so much of the judgment of divorce nisi, as amended, as it values implicitly the wife's interests in her three family businesses and remand for further proceedings not inconsistent with this opinion concerning the marketability and minority discounts. The judge may hold such further hearing as she deems necessary and shall enter such further orders, as appropriate. In all other respects, including the orders for alimony and attorney's fees, the judgment is affirmed. The judgment on the amended complaint for civil contempt is also affirmed.

*So ordered.*

---

[28]Rule 25 provides that "[i]f the appellate court shall determine that an appeal is frivolous, it may award just damages and single or double costs *to the appellee,* and such interest on the amount of the judgment as may be allowed by law" (emphasis supplied).