NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-173                                          Appeals Court

DAVID M. DILANIAN  vs.  TRAUTE L. DILANIAN.

No. 17-P-173.

Norfolk.     July 12, 2018.  -  November 21, 2018.

Present:  Blake, Sacks, & Ditkoff, JJ.

Divorce and Separation, Division of property, Pension benefits,
    Alimony, Relief from judgment.  Corporation, Valuation.
    Value.

Complaint for divorce filed in the Norfolk Division of the
Probate and Family Court Department on January 11, 2011.

The case was heard by Jennifer M.R. Ulwick, J., and motions
for reconsideration and for postjudgment relief or amendment of
the final judgment were heard by her.

Matthew Bove for the husband.
L. Richard LeClair, III, for the wife.

DITKOFF, J.  David M. Dilanian (husband) appeals from the

amended judgment of divorce nisi entered by a Probate and Family

Court judge and the subsequent denials of his postjudgment

motions.  The most significant issue revolves around a pension

plan that the judge found belonged entirely to the husband but

that the husband alleges belonged partially to his now-deceased father and thus now belongs partially to his sister. We discern no clear error in the judge's factual findings, and we conclude that the sister's interests are not impaired by the judgment transferring sixty per cent of the pension plan to Traute L. Dilanian (wife), as the remaining portion is more than sufficient to satisfy any claim by the sister. Further discerning no clear error in the judge's findings regarding the value of the husband's business and the husband's income, and concluding that the judge acted within her discretion in denying the husband's motion for relief under Mass. R. Dom. Rel. P. 60 (b), we affirm.

1. Background. The husband and wife were married in 1981, had three children together, and lived a comfortable upper-middle class lifestyle. During their thirty-one year marriage, the wife was the homemaker while the husband was self-employed, running a successful business. The marriage began to break down in 2005, and the husband filed for divorce in January 2011, after five years of counseling and a three-month trial separation. Their children were all of adult age and emancipated, and the parties were able to resolve amicably the disposition of the marital home. Much of the trial concerned the value of the husband's business and the husband's share in various assets and an inheritance from his father.

a.  <u>M.E. Dilanian Co., Inc</u>.  Since 1984, the husband has worked at M.E. Dilanian Co., Inc. (M.E. Dilanian), a family-controlled company that purchases food products from wholesalers and then sells the products to supermarkets.  The husband and his father operated the company as coowners until approximately 1998 or 1999, when the husband became the sole stockholder in the company.  The husband's father, however, continued to work at the company until his death in March 2011.

By the time of the divorce proceedings, therefore, the husband was the sole owner of the business with control over both the company accounts and his own compensation.  To avoid double taxation on corporate income,[1] the husband took a base salary and then paid himself a bonus out of the year-end profits.  Accordingly, he would generally pay out year-end bonuses so that the company would be left with only $5,000 to $10,000 of retained earnings for the year.  The husband's financial statement reported that his net income increased from $204,500 in 2008 to $388,000 in 2010.  Once the divorce proceedings began, the husband decreased his pay to $217,000 in 2011 and $215,000 in 2012.  At the same time, and contrary to prior practice, the amount of cash left in M.E. Dilanian

---

[1] The company is a C corporation and, therefore, is subject to the corporate income tax on any profits retained.

accounts increased by over $294,000 from July 2011 to June 2012. The husband also routinely received additional compensation from M.E. Dilanian in the form of interest payments, pension contributions, lease payments for an automobile, and expense reimbursements.

b. <u>M.E. Dilanian retirement plans</u>. M.E. Dilanian established a defined contribution retirement plan in 1989 and a defined benefit plan at some point between 2002 and 2011. The husband testified that he and his father were the only participants in both plans.

Under the defined contribution plan, the company was supposed to contribute twenty-five per cent of a participating employee's income each year to the plan. At some point, however, the company ceased contributing to the plan. As a defined contribution plan, the money contributed toward each participant's retirement belonged to that participant, assuming he met the vesting requirements, and was to be paid out accordingly upon retirement or death. The plan set the retirement age at sixty-five years of age.[2] The husband and his father were the only trustees of the plan until the father's death, when the husband became the sole trustee.

_____

[2] The husband's father was approximately sixty-five years old when the defined contribution plan was established.

Upon the father's death on March 1, 2011, the husband allocated $663,961 of the defined contribution plan's $1,416,769 balance to his father's estate. The husband allocated $46,690 of the defined benefit plan's balance to his father's estate. With one exception, however, the husband failed to produce any documents to substantiate contributions made by M.E. Dilanian to the defined contribution plan on the father's behalf that predate the beginning of divorce proceedings. Similarly, although the husband testified that the defined benefit plan was created in or around 2002, the only documents he produced showing the establishment of a defined benefit plan reflect that it was established after the father's death.

The husband did produce Federal tax forms 5500-EZ that predated the divorce proceedings. These documents, however, vary. They state that the defined contribution plan had one participant in 2007; two in 2008; three in 2009; three at the beginning of 2010, but only one at the year's end; and two participants in 2011.

c. Inheritance. The husband's father's estate was administered by the husband and his sister as joint executors. On its estate tax returns, the estate reported assets of $4,165,798. That amount included $710,651 from the M.E. Dilanian pension plans. The estate also included $847,415 previously placed in the Dilanian Family IRA Spray Trust (spray

trust).[3]  There is no dispute that the balance of the estate, consisting of cash, a brokerage account, and the assets of two other trusts, will be divided evenly between the husband and his sister.

By its terms, the spray trust divides its assets among the children of the husband and his sister.  Absent the untimely demise of all of the husband's and his sister's descendants, the trust assets would not be distributed to the husband.  Even though the husband was one of the trustees of the spray trust, he testified at trial (in what he later asserted was a mistake) that he and his sister were the only beneficiaries of the father's estate and that he would inherit half of the $4 million estate.  His testimony, therefore, assigned to himself the approximately $423,700 that will instead go to his children.

d.  Findings and rulings.  At trial, the husband valued M.E. Dilanian at $200,000.  The judge ultimately credited this valuation, except that she found that the business value of M.E. Dilanian also includes the value of a $150,000 note payable to

---

[3] Apparently because the beneficiaries of the trust did not have an "immediate and unrestricted right to possess" the trust assets, it remained in the father's estate for estate tax purposes.  See Wooley v. United States, 736 F. Supp. 1506, 1509 (S.D. Ind. 1990).

the husband for a personal loan made to the company.[4] Accordingly, the judge valued the company at $350,000. The judge also found that the company held cash assets with a value of $634,061.06.[5] The judge awarded ownership of the company to the husband.

Regarding the husband's income, the judge found that the husband had artificially lowered his income. The judge found that the husband's real annual income was approximately $325,000. The judge found that the wife's imputed annual income was $20,000. The judge then imposed an alimony obligation of $2,000 per week until the husband reaches full retirement age "as defined in G. L. c. 208, § 48."

The judge found that the husband was the only participant in both the defined contribution and the defined benefit plans.[6] Noting that the father would have been seventy-eight years old when the defined benefit plan was purportedly created and that the records produced by the husband showed that the plan was executed after the father's death, the judge did not credit the

---

[4] Although the judge noted that the husband listed this note as a personal asset, there is no indication that the judge double counted the $150,000.

[5] The wife makes no claim on appeal that the judge undervalued the company.

[6] The husband raises no challenge on appeal to the judge's ruling regarding the defined benefit plan.

husband's claim that the father was a participant in the defined benefit plan.  Similarly, based primarily on the husband's failure to produce documents substantiating his claims "despite receiving request for production, trial subpoenas and a court order," the judge did not credit the husband's testimony that the father was a participant in the defined contribution plan.

The judge considered the husband's entitlement to half of his father's estate as a factor supporting his "optimistic outlook of financial stability."  The judge, however, found that the inherited assets "were received late in the marriage and were not woven into the fabric of the marriage" and thus should remain with the husband.  She ordered the husband to transfer sixty per cent of both the defined contribution plan and the defined benefit plan to the wife.[7]  She ordered the husband to transfer the full amount of two smaller retirement plans to the wife, gave the husband the right to buy out the wife's interest in the marital home and another piece of real estate, divided the joint bank accounts equally, and ordered the husband to pay the wife $150,000.  Shortly thereafter, the judge issued an amended judgment of divorce nisi, changing only the time at which alimony commenced.  The husband filed a timely appeal.

---

[7] At the end of 2012, the defined contribution plan had a value of $1,573,389.67, and the defined benefit plan had a value of $494,414.05.

2. <u>Defined contribution plan and adjudication of third-party rights</u>. Judges are granted "a broad degree of discretion in assigning 'to either husband or wife all or any part of the estate of the other, including . . . retirement benefits, . . . pension, <u>profit-sharing</u>, annuity, [and] deferred compensation.'" <u>Adams</u> v. <u>Adams</u>, 459 Mass. 361, 372-373 (2011), quoting G. L. c. 208, § 34. Although we review the propriety of the legal standards applied by the judge, the discretionary determinations of property division "will not be reversed unless plainly wrong and excessive." <u>Hassey</u> v. <u>Hassey</u>, 85 Mass. App. Ct. 518, 524 (2014).

On appeal, the husband argues that M.E. Dilanian's defined contribution plan belonged partially to his now-deceased father and thus now belongs partially to his sister. It is undisputed that the husband was a participant in and beneficiary of the defined contribution plan. At trial, the husband supported his contention that he was not the <u>sole</u> participant with his own testimony, documents created after the divorce proceedings began, and the inconclusive tax forms he disclosed. The husband produced no evidence tracking the individual contributions for any participant. The husband testified that this information was available to him as the plan's trustee, but he was either unable or unwilling to submit it to the court as evidence at trial. As the judge could infer that the documentation either

contradicted the husband's assertions or did not exist at all, the judge could reasonably disbelieve the husband's testimony and the documentation created after the divorce proceedings began.  See Prenaveau v. Prenaveau, 81 Mass. App. Ct. 479, 496 (2012), quoting Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995) (trial judge's credibility findings upheld "except on the most compelling of showings").

This lack of evidence was exacerbated by the defined contribution plan's tax forms showing anywhere from one to three plan participants between 2007 and 2011.  Even if the judge credited the husband's expert that Form 5500-EZ, Annual Return of One-Participant (Owners and Their Spouses) Retirement Plan, may be properly filed when one of the participants is the nonowner father of the owner, there was no testimony to account for the shifting number of participants from year to year.  Cf. Vedensky v. Vedensky, 86 Mass. App. Ct. 768, 774 (2014) ("The judge was not required to accept the opinion of the experts, and was entitled to credit all, part, or none of their testimony").

It is true that, since the divorce filing and the husband's father's death, the husband has consistently taken the position that his father was a participant in the defined contribution plan, and the husband has created documents reflecting this position.  The fact, however, that no such documents can be produced that predate the divorce filing is strong evidence upon

which the judge could reasonably conclude that the division of the defined contribution plan was a postdivorce filing invention. Accordingly, the judge was not required to credit the allocation of $663,961 to the father's estate, nor was it clearly erroneous to find the husband was the sole participant and beneficiary of the plan. See Caveney v. Caveney, 81 Mass. App. Ct. 102, 115 (2012) (discerning no error where trial judge did not credit husband's testimony in light of inconsistent evidence).

Nonetheless, because the judge ordered the husband to transfer sixty per cent of the defined contribution plan to the wife, we must consider the asserted interest of the husband's sister in that defined contribution plan. In Amrhein v. Amrhein, 29 Mass. App. Ct. 336 (1990), we considered a judicial order that the husband execute a mortgage for the benefit of the wife on property he claimed was held in trust for the benefit of his children. Id. at 339-340. Although the judge had "ample reason to doubt the reality of the trust" and find that the property was held by the husband himself, id. at 338,[8] we concluded that such an order could not be entered without

_____

[8] In Amrhein, the transfer of the property from the husband individually to the trust was likely fraudulent and used "as a vehicle to conceal the husband's income and assets." 29 Mass. App. Ct. at 338.

joining the children and the husband in his capacity as trustee of the purported trust.  Id. at 340-341.  As we explained, the judge's finding that the husband was the owner was binding upon him but could not be allowed to "adversely affect the interests of third persons who are not bound by that finding" without their being heard by being brought into the action.  Id. at 340.

Here, however, contrary to the husband's argument, the judge's order will not adversely affect the interests of third persons.  The plan documents establish that the beneficiaries of any portion of the defined contribution plan that belonged to the husband's father are the husband and his sister, in equal shares.  The sister, as coexecutor of the estate, signed an estate tax return taking the position that $663,961 of the plan belonged to the father.  Accordingly, half of that amount ($331,981) could be claimed by the sister.  Once sixty per cent of the plan is transferred to the wife, the remaining amount will be well in excess of the amount the sister claimed in the estate tax return and appears able to claim.[9]

---

[9] The husband's retained forty per cent of the defined contribution plan was $629,355.87 (as valued at the end of 2012).  Even if the claimed share of the father is given a prorated share of the increase in value between the father's death and the end of 2012, the sister's share would appear to be no more than $369,000.

Because the portion of the plan remaining with the husband is adequate to satisfy any claim by the sister, the judge's allocation will not impair her interests. If the sister claims a share of the plan, she may pursue it against the husband and file a suit, if necessary. That this theoretically may result in the husband's receiving less than forty per cent of the plan is of no moment. "A finding by the judge in these circumstances that a particular asset is owned by a party individually . . . is binding on the parties to the action but not on persons not served." Amrhein, 29 Mass. App. Ct. at 339. Having failed to substantiate his position that he was not the sole participant in the plan, the husband is bound, for purposes of this divorce action, by the judge's findings.

3. Business valuation. The valuation of a business interest for purposes of the division of marital assets is a question of fact. Adams, 459 Mass. at 380. We review the trial judge's findings for clear error. Caveney, 81 Mass. App. Ct. at 109.

Contrary to the husband's assertions, the trial judge did not value M.E. Dilanian based on the cash held in company accounts at the time of trial. The judge expressly found M.E. Dilanian "has a business value of $350,000" based on the husband's valuation of $200,000, plus the $150,000 note payable to him by the company. That the judge also mentioned that the

company possessed "cash held with a value of $634,061.06" (after subtracting the $150,000 note payable to the husband) and that "the company maintains over $500,000 in the business accounts" does not negate the judge's specific finding that the company has a value of $350,000.[10]

We discern no clear error in this valuation. The judge was entitled to credit the husband's valuation of his own company. See Prenaveau, 81 Mass. App. Ct. at 496. Considering that the husband was the sole owner of the company, there is nothing unreasonable in disregarding the $150,000 note payable to the husband and considering that property part of the value of the company. Cf. Adams, 459 Mass. at 373 (properly assigning "the present value of a spouse's interest in a [business] to the divisible marital estate").[11]

4. Alimony. As with the division of marital property, "[a] judge has broad discretion when awarding alimony." Zaleski v. Zaleski, 469 Mass. 230, 235 (2014). Accord Ludwig v. Lamee-

_____

[10] The amount of cash held by M.E. Dilanian was relevant to the wife's claim that the husband was purposefully leaving cash and income in the company to reduce his income artificially.

[11] The husband's argument that the judge erred in finding that M.E. Dilanian had any value at all "due to its speculative nature" fails, as the husband testified that the value of the company was $200,000, and, as we have noted, the judge was entitled to credit his testimony. See Prenaveau, 81 Mass. App. Ct. at 496.

Ludwig, 91 Mass. App. Ct. 36, 40 (2017) (within judge's discretion to consider employee spouse's stock options "as a source of income in the alimony calculation").  In that regard, "[a] judgment will not be disturbed on appeal unless 'plainly wrong and excessive.'"  Zaleski, supra at 236, quoting Heins v. Ledis, 422 Mass. 477, 481 (1996).

In this case, the husband reported that his gross income increased in the years prior to the divorce from $204,500 in 2008 to $388,000 in 2010 but then decreased to $217,000 in 2011 and $215,000 in 2012.  He neglected, however, to include additional compensation received from the company for those years in the form of interest and expense reimbursements.  The judge properly considered all of the husband's income from the company, finding a total compensation of approximately $475,000 in 2011 and $266,000 in 2012.  See Hassey, 85 Mass. App. Ct. at 525 (alimony determined from parties' gross income).

Moreover, the husband was the sole owner of M.E. Dilanian, his compensation was tied to the profitability of the company, and the husband paid himself out of company accounts based on its year-end earnings.  Although "[a] corporation may reasonably choose to retain income" to maintain its current business or expand its operations, Halpern v. Rabb, 75 Mass. App. Ct. 331, 337 (2009), the judge was not required to credit the husband's reasons for the increase of over $294,000 held in company

accounts at year end from 2011 to 2012.  Holding excess cash in the company accounts, in addition, was contrary to the husband's prior practice of maintaining only $5,000 to $10,000 in retained earnings annually to avoid double taxation on corporate income.

In sum, contrary to the husband's assertion, the evidence supported the finding that the husband's reported income was increasing until he filed for divorce in 2011, and that the husband intentionally reduced his own salary while amassing corporate earnings usually directed toward his personal income. Given this evidence and the husband's furtive financial disclosures, including his failure to prepare a 2012 financial statement for M.E. Dilanian, the trial judge could reasonably conclude the husband artificially reduced his income to alter his financial condition in light of the impending divorce.  See Caveney, 81 Mass. App. Ct. at 114 (discerning no error in finding husband's representations of business financials "clearly false" in light of incomplete and contradictory evidence).  Cf. J.S. v. C.C., 454 Mass. 652, 663 (2009) ("corporate structures should not be used to shield available income that could and should serve as available sources" of marital support).  Specifically, at the end of the 2012 fiscal year, the account used to pay the husband's salary held an extra $76,000, and the judge could reasonably impute those retained earnings to the husband as income for purposes of calculating

alimony.  See id. at 664 ("the judge should weigh affirmative evidence of an attempt to shield income by means of retained earnings[;] . . . [i]n that regard, the corporation's history of retained earnings and distributions may be relevant").  Accord Halpern, 75 Mass. App. Ct. at 337.  Including the excess $76,000 with the husband's $266,180 in gross income in 2012, it was "not 'plainly wrong'" to find the husband's income was closer to $325,000 than $200,000.  Vedensky, 86 Mass. App. Ct. at 775, quoting Redding v. Redding, 398 Mass. 102, 107 (1986).  There was no error, see Caveney, supra at 115, nor a basis to merit reconsideration.

5.  Inheritance.  Within a year of the amended judgment of divorce nisi, the husband filed a motion for relief from judgment under Mass. R. Dom. Rel. P. 60 (b) (1) and 60 (b) (6).[12] The motion stated that "[r]ecently it was discovered" that the husband was not a beneficiary of the spray trust.  At the hearing, when asked why the husband had misunderstood the provisions of the spray trust, his counsel stated that the husband told him that he had been relying on the advice of the attorney handling the estate.  No affidavit, testimony, or other

---

[12] Although the husband styled the motion as being made pursuant to the Massachusetts Rules of Civil Procedure, this case is governed by the Massachusetts Rules of Domestic Relations Procedure.  See Mass. R. Dom. Rel. P. 1.

evidence was presented to substantiate this assertion.  The judge denied the motion, and the husband has appealed from that denial as well.

Under Mass. R. Dom. Rel. P. 60 (b) (1), "upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect," provided the motion is "made within a reasonable time" and within one year.[13]  In deciding a rule 60 (b) (1) motion, whether under Mass. R. Civ. P. 60 (b) (1), 365 Mass. 828 (1974), or Mass. R. Dom. Rel. P. 60 (b) (1), a judge considers several factors, including "(1) whether the offending party has acted promptly after entry of judgment to assert his claim for relief therefrom; (2) whether there is a showing either by way of affidavit, or otherwise apparent on the record, that the claim sought to be revived has merit; (3) whether the neglectful conduct occurs before trial, as opposed to during, or after the trial; (4) whether the neglect was the product of a consciously chosen course of conduct on the part of counsel; (5) whether prejudice has resulted to the other party; and (6) whether the error is chargeable to the party's legal representative, rather than to

---

[13] The husband's motion invoked both rule 60 (b) (1) and 60 (b) (6), but he raises only rule 60 (b) (1) on appeal.

the party himself; for 'the courts have been reluctant to attribute to the parties the errors of their legal representatives.'"  Berube v. McKesson Wine & Spirits Co., 7 Mass. App. Ct. 426, 430-431 (1979), quoting Barber v. Tuberville, 218 F.2d 34, 36 (D.C. Cir. 1954).  See Sahin v. Sahin, 435 Mass. 396, 398 n.4 (2001) (proper to apply standards applicable to Mass. R. Civ. P. 60 to motions under Mass. R. Dom. Rel. P. 60; text of two rules is identical).  "Relief is not justified under rule 60(b)(1) for 'any garden-variety oversight.'"  Freitas v. Freitas, 26 Mass. App. Ct. 196, 197 n.2 (1988), quoting Goldstein v. Barron, 382 Mass. 181, 186 (1980).

"A motion for relief under rule 60(b) is directed to the sound discretion of the motion judge, and we review the judge's ruling for abuse of discretion."  Ulin v. Polansky, 83 Mass. App. Ct. 303, 308 (2013), quoting Nortek, Inc. v. Liberty Mut. Ins. Co., 65 Mass. App. Ct. 764, 775 (2006).  Accord Dalessio v. Dalessio, 409 Mass. 821, 833 (1991).  A judge has "considerable discretion in ruling on [a] motion for relief under rule 60 (b) (1)."  Hermanson v. Szafarowicz, 457 Mass. 39, 47 (2010). We discern no abuse of discretion here.

"A party's estate for purposes of equitable division under G. L. c. 208, § 34, 'includes all property to which a party holds title, however acquired.'"  Pfannenstiehl v. Pfannenstiehl, 475 Mass. 105, 110 (2016), quoting Williams v.

Massa, 431 Mass. 619, 625 (2000). The trial judge, therefore, properly considered the husband's substantial inheritance in determining the division of marital assets in this case.[14] See Adams, 459 Mass. at 378 (§ 34 vests judge with discretion to consider acquisition of assets by parties' respective estates in dividing marital property). Accord E.H. v. S.H., 59 Mass. App. Ct. 593, 597 n.7 (2003), quoting Davidson v. Davidson, 19 Mass. App. Ct. 364, 374-375 (1985) (future inheritance "may be considered 'under the § 34 criterion of "opportunity of each for future acquisition of capital assets and income"' in determining what disposition to make of the property which is subject to division").

That the husband's actual inheritance is lower than that found by the judge is beyond serious dispute. Nonetheless, the error was caused by the husband's own testimony. The husband was a trustee and executor of his father's estate and a trustee of the spray trust. He had a legal duty to be aware of the obligations and expectancies of both entities, and it was reasonable for the judge to credit without further investigation the husband's testimony that he and his sister were the sole

_____

[14] The wife conceded she was not entitled to share in the father's estate, and she was not awarded any part of the husband's inheritance in the divorce judgment. Cf. Davidson v. Davidson, 19 Mass. App. Ct. 364, 374-375 (1985) (error to divide husband's after-acquired property in § 34 action, but potential inheritance may be considered in dividing marital property).

beneficiaries of the estate he was charged with administering. Indeed, the husband personally signed the estate tax forms assigning the spray trust $847,415 prior to trial and should have known his share of the inheritance would accordingly be reduced by the time he testified. Moreover, the amount of the inheritance was not integral to the judge's division of the marital estate but rather went to supporting the judge's finding that the husband "has a far more optimistic outlook of financial stability" than the wife, a finding that holds even with the smaller inheritance. The judge could reasonably attribute the omission of that fact in the husband's testimony to the husband's own negligence, and find that the exact amount of the inheritance was not particularly important to the division of assets. Under such circumstances, the trial judge acted within her discretion in denying the husband relief.

6. Conclusion. The amended judgment of divorce nisi is affirmed, as are the orders denying the husband's postjudgment motions.

So ordered.